**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SPECTRUM BRANDS INC.,

Plaintiff,

v.

TRISTAR PRODUCTS INC., KISHORE MIRCHANDANI, individually and as trustee of AM KARMA 2021 FAMILY TRUST, ANJALI MIRCHANDANI, individually and as trustee of KM KARMA 2021 FAMILY TRUST, STEVEN SOWERS, as trustee of AM KARMA 2021 FAMILY TRUST and KM KARMA 2021 FAMILY TRUST, AM KARMA 2021 FAMILY TRUST, KM KARMA 2021 FAMILY TRUST, A&R REALTY ENTERPRISES LLC, CENTRE AVENUE LLC, and MT. ANDERSON LLC,

Defendants.

Case No.

**COMPLAINT**

Plaintiff Spectrum Brands Inc. ("Spectrum"), sues Defendants Tristar Products Inc. ("Tristar"), Kishore "Keith" Mirchandani ("Kishore"), Anjali Mirchandani ("Anjali"), KM Karma 2021 Family Trust ("KM Trust"), AM Karma 2021 Family Trust ("AM Trust," and with KM Trust, the "Trusts"), A&R Realty Enterprises LLC ("A&R"), Centre Avenue LLC ("Centre Avenue"), Mt. Anderson LLC ("Mt. Anderson," and with A&R and Centre Avenue, the "Real-Estate Companies"), and Steven Sowers ("Sowers") (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1. This case is about an elaborate fraud scheme concocted by Tristar and Kishore—Tristar's showman founder and CEO—to fraudulently induce Spectrum, with the assistance of the other defendants, to buy most of Tristar's kitchen-appliance business they were trying to unload, and put hundreds of millions of dollars ultimately into the pockets of Kishore and his wife, Anjali. This fraud only could have occurred, and did occur, by convincing and encouraging Kishore's top lieutenants and others at Tristar to take extraordinary measures to conceal the forthcoming downfall of the Tristar house of cards just long enough to dump the ailing business on Spectrum.

2. Kishore put this scheme in motion by applying tremendous pressure on, and offering once-in-a-lifetime incentives to, his top deputies at Tristar: H. Matthew Fisher ("Fisher"), Tristar's then-President of Retail, and Edward Hendrick, III ("Hendrick"), Tristar's then-Chief Operating Officer and Chief Financial Officer. Fisher and Hendrick, in turn, carried out the plan and dispatched their direct reports from Tristar's finance and sales teams accordingly. Jim Myers, Tristar's then-General Counsel and his direct reports facilitated the plan as well.

3. The scheme worked. Tristar and Kishore managed to convince Spectrum that Tristar was a thriving business capable of generating tens—if not hundreds—of millions of dollars in annual EBITDA, and Spectrum bought Empower Brands LLC f/k/a HPC Brands LLC, an entity carved out of Tristar that held most of Tristar's assets ("Empower" or the "Company") in February 2022. The terms of the acquisition (the "Acquisition") were memorialized in a February 3, 2022 Membership Interest Purchase Agreement (the "MIPA") among the Company, Tristar, Spectrum, and Kishore. With the requisite unanimous written consent of Tristar's shareholders—i.e., Kishore and the Trusts—the Acquisition closed on February 18, 2022 (the "Closing").

4. As part of the Acquisition, Spectrum acquired the Company and its rights to the PowerXL, Emeril Lagasse, and Copper Chef product brands, among others (collectively, the "Brands"), as well as the Company's existing inventory and related commercial agreements.

5. After conducting extensive due diligence, including internal teams and world-renowned external advisors, Spectrum paid $325 million for the Company at Closing (the "Purchase Price"). Kishore also had the opportunity under the MIPA to earn another $125 million over two years if the Company met certain gross profit targets during that time (which he did not earn). Because of Defendants' coordinated subterfuge to mask their pump-and-dump scheme, Spectrum's diligence did not uncover the truth about the Company. Tellingly, within days of Closing, nearly all the Purchase Price proceeds were wired by Kishore and Anjali out of Tristar and into bank accounts owned by them individually or the Trusts. Kishore also created a new entity, Trend Makers LLC, and funneled what little remained of Tristar into it, leaving Tristar an empty shell without ongoing operations or assets. Spectrum, by contrast, was left holding the bag. After taking control of the Company at Closing, Spectrum discovered that Tristar's and Kishore's portrayal of the Company as a stable, profitable business could not be further from the truth.

6. Relying on what Tristar and Kishore represented about the Company, Spectrum also entered into a host of other agreements on or around the Closing, including to lease extensive real estate to support the Company's then-represented size and scope, secure the services of Kishore and Anjali through consulting relationships, and retain about 50 members of Tristar's then-existing team as Spectrum employees, including Fisher, Hendrick, and Tristar's other sales leaders and representatives (collectively, such agreements and arrangements, the "Ancillary Agreements"). As a result, the post-Closing Company differed from the pre-Closing Company in only two material ways: First, Tristar and Kishore no longer were working to prop up the Company

to sell, and so the effect of those efforts disappeared, and second, the Company now was outside Kishore's control and thus was subject to proper GAAP accounting and related controls.

7. Under Article IX of the MIPA, Spectrum is entitled to indemnification from the Indemnity Escrow Amount,[1] Tristar, and, at Spectrum's "option," Kishore, and to be held harmless for all "Losses"—i.e., "any damages, losses, liabilities, obligations, Taxes, claims of any kind, interest or expenses (including reasonable out-of-pocket attorneys' fees and expenses)"—it incurs as a result of, in connection with, or arising out of, among other things, Fraud by Tristar, the Company, or Kishore prior to the Closing.

8. "Fraud" is expressly actionable under the MIPA and is defined as fraud "(i) in the making of any representation, warranty, covenant, or agreement" in the MIPA, or "(ii) otherwise in connection with the transactions contemplated" in the MIPA. Under Delaware law, fraud exists when (1) Defendants made a false representation or warranty of fact, or a fraudulent covenant; (2) with the knowledge or belief that the representation, warranty, or covenant is false or fraudulent; (3) intending to induce Spectrum's reliance on the false statements or fraudulent covenants; (4) on which Spectrum relied; and (5) caused Spectrum to suffer harm.

9. That is exactly what occurred here.

10. Spectrum thus brings this action against Tristar, Kishore, Anjali, the Trusts, the three affiliated Real-Estate Companies, and Sowers to recover its substantial losses resulting from Tristar's and Kishore's fraud, including (i) more than $250 million in actual damages from the Acquisition as of the Closing, and (ii) millions more dollars, including out-of-pocket expenses such as to investigate Defendants' misconduct and bring this lawsuit.

[1] Under the MIPA, the Indemnity Escrow Amount refers to $25 million that is held "in escrow following the Closing to cover any indemnification claim by [Spectrum]."

11. Spectrum agreed to execute the MIPA and pay the Purchase Price—and enter into the Ancillary Agreements—in reliance on the representations, warranties, and covenants given by Tristar and, by extension, Kishore in the MIPA. After the Closing, the performance of the Company drastically declined and previously undisclosed problems emerged. Spectrum eventually began an investigation and painfully discovered that certain of those representations, warranties, and covenants were false. What's more, Tristar and Kishore knew the representations, warranties, and covenants were false as of the Closing but intentionally made them anyway—in concert with Anjali, the Trusts, the Real-Estate Companies, and Sowers—to induce Spectrum to close the Acquisition and pay the Purchase Price. Spectrum's losses were massive: hundreds of millions of dollars in damages, including as a direct result of the Closing and consummation of the Acquisition; the destruction of poor-quality, defective, and/or dangerous Company products; implementation of difficult cost-saving measures (including terminating hundreds of employees); substantial harm to the business reputation and value of the Company and the Brands, including with retail customers, business partners, and employees; millions of dollars in unnecessary rent and consulting payments; a costly investigation into the misconduct at issue; and expenses for this lawsuit.

12. <u>Tristar's and Kishore's False Representations, Warranties, and Covenants</u>: Tristar and Kishore knowingly made at least 14 false representations, warranties, and covenants in the MIPA, at Sections 3.8(a), 3.8(b), 3.8(c), 3.9(a), 3.9(b), 3.10, 3.18, 3.22, 3.24, 3.25, 3.28, 6.2, 7.2(a), and 7.2(c) (collectively, the "False RW&C").

13. Under the False RW&C, Tristar and Kishore gave representations, warranties, and covenants about, among other things, the finances, business operations, assets, and inventory of Tristar; the products Spectrum bought under the Acquisition; the Company holding those assets;

and how the business operations of the Company would continue through, and what was required as of, the Closing. Specifically, Tristar and Kishore represented, warranted, and covenanted:

a. ***Section 3.8(a)***: The financial statements attached to the MIPA (the "Financial Statements") were true, correct, and complete, fairly presented in all material respects the financial position and results of operations of Tristar and the Company, and complied with GAAP (subject to certain exceptions not relevant here).

b. ***Section 3.8(b)***: Except as disclosed in the MIPA, the Business did not have and at the Closing the Company would not have any liabilities of any kind or type, whether absolute, accrued, asserted, unasserted, known, unknown, contingent, or otherwise.

c. ***Section 3.8(c)***: The accounting controls of Tristar were sufficient to provide reasonable assurances that (i) all transactions were executed in accordance with management's general or specific authorization and (ii) all transactions were recorded as necessary to permit the accurate preparation of the Audited Financials and the Unaudited Seller Financials in accordance with GAAP. As well, to Tristar's Knowledge, Tristar had not received any written or oral material complaint, allegation, assertion, or claim regarding deficiencies with respect to the accounting or auditing practices, procedures, methodologies, or methods of Seller or its internal accounting controls, including any material complaint, allegation, assertion, or claim that Tristar had engaged in questionable accounting or auditing practices.

d. ***Section 3.9(a)***: Between December 31, 2021, and Closing, there was no "Material Adverse Effect," i.e., no "event, change, or effect which, individually or in the aggregate, [was] or would reasonably be expected to have a material adverse effect on . . . the financial condition, business or results of operations" of the Company.

e. ***Section 3.9(b)***: The Company had been conducted in all material respects in the ordinary course of business.

f. ***Section 3.10***: Tristar was not and had not been in violation of any applicable "Laws, rules, regulations, codes, ordinances, orders, policies, and guidelines of any Governmental Authorities, which violation or delinquency would reasonably be expected to be material to the Business."

g. ***Section 3.18***: There did "not exist any event which, with the giving of notice, the lapse of time or both, would constitute a material breach or default by [Tristar], its Affiliates or, or after giving effect to the Closing, the Company under such Material Contract, would cause or permit the termination of such Material Contract, the acceleration or increase of [Tristar], its Affiliates or, after giving effect to the Closing, the Company's material obligations thereunder, or the loss of any material benefits to the Business or, or after giving effect to the Closing, the Company thereunder" (collectively, "Events of Default").

h. ***Section 3.22***: The "Transferred Assets," which include, among other things, the products being acquired by Spectrum through the Acquisition of the Company, were "sufficient for the continued conduct of the [business] after the Closing in substantially the same manner as conducted by [Tristar] prior to the . . . Closing."

i. ***Section 3.24***: No "stockholder[], member[], director[], manager[], or officer[] of [Tristar]" or "'immediate family member' of such individual . . . is involved in any business arrangement or relationship with, or is party to any contract with, the Business or the Company" or "owns any material property or right, tangible or intangible" used by the Business or the Company.

j. ***Section 3.25***: All the products being acquired by Spectrum were "in material conformity" with all applicable contractual commitments (the "Contractual Commitments") and all express and implied warranties (the "Product Warranties").

k. ***Section 3.28***: All the products being acquired by Spectrum "consist[ed] of a quality and quantity useable or salable in the ordinary course of business."

l. ***Section 6.2***: Through the Closing, Tristar, Kishore and the Company conducted the Business and the Company in the ordinary course of business and in material compliance with applicable Law, and used "reasonable efforts to maintain and preserve the relationships of the Business and the Company with employees, customers and suppliers, and not deliberately take or omit to be taken any action, which would result in a Material Adverse Effect." As well, the Company, Kishore, and Tristar would not and did not "(h) transfer, assign, sell or otherwise dispose of any material asset of the Business or the Company other than sales of inventory in the ordinary course of business . . .; or (w) enter into any agreement to do any of the foregoing, or any action or omission that would result in any of the foregoing."

m. ***Section 7.2(a)***: The representations and warranties made by Tristar and Kishore were true and correct as of the Closing Date as through such representations and warranties were made as of the Closing, and the Company, Tristar, and Kishore had duly performed or complied with, in all material respects, all covenants and obligations under the MIPA prior to or at Closing.

n. ***Section 7.2(c)***: The Company had not suffered a Material Adverse Effect between the execution of the MIPA and the Closing.

14. <u>These False RW&C Were Knowingly Untrue</u>: Tristar and Kishore knew the False RW&C were untrue. Per the MIPA, Tristar's Knowledge is the actual knowledge of Kishore, Hendrick, Fisher, or Myers, including what it would be after due inquiry of their direct reports.

15. Because one or more of these individuals had Knowledge of the falsity of the False RW&C under this standard, that Knowledge is imputed to Tristar. The fraud committed with respect to each False RW&C stands on its own. For the sake of simplicity, the False RW&C can be grouped into three broad categories as set forth below:

a. *The Operations Misrepresentations*: At Kishore's instruction, Hendrick, Fisher, and other Tristar employees and agents took actions during the time leading to the Closing—and especially Q4 2021 and Q1 2022—to misrepresent and conceal the tumbling demand for Tristar's products by using non-ordinary-course sales practices to induce the Company's retail customers to purchase more inventory than they would have if the Company were operating normally. The outcome of these tactics was to flood the retail market with the products Spectrum acquired from Tristar via the Acquisition, saturating distribution channels, and ensuring substantially lower demand for the products after the Closing. Additionally, Tristar and Kishore misrepresented and concealed the true nature of the Company's relationship with Anjali, who furthered Kishore's frauds.

b. *The Financial Statement Misrepresentations*: At the same time, to mask the declining financial performance of the Company—the truth of which would have, at a minimum, revealed the Company's substantially diminished capacity to generate profit and that Tristar was using the sales tactics described above to make more sales than it otherwise could have—Tristar and Kishore inaccurately accounted for at least two key metrics. First, they misrepresented and concealed Tristar's true "Dilution,"[2] which was exceptionally high leading up to the Closing given Tristar's declining demand and excess inventory problems. Second, they misrepresented and concealed Tristar's true financial picture by making ad hoc adjustments to the Financial Statements presented to Spectrum to overstate sales revenue and EBITDA and otherwise improperly account for excess inventory. Moreover, Tristar and Kishore misrepresented and concealed the Company's current and contingent liabilities (both under GAAP and regardless of GAAP) through the faulty accounting tactics described above as well as by misrepresenting and concealing the serious problems with the Company's products, which are further described below. In addition, Tristar's accounting controls were woefully deficient, despite Tristar's and Kishore's False RW&C that Tristar maintained sufficient accounting controls and had not received any material complaints regarding deficiencies.

c. *The Products Misrepresentations*: Before the Closing, Tristar and Kishore knew not only that demand for Tristar's products was waning, but, making matters even

---

[2] As discussed in greater detail in Paragraphs 40 to 43, "Dilution" is a reserve on a company's financial statements that accounts for any factors that may reduce the amount of its overall gross sales, translating, in turn, into the total net dollar amount the company will realize from sales, i.e., its net sales.

worse, the products exhibited defects and/or did not conform to applicable Product Warranties and Contractual Commitments. Fisher, Hendrick, and Myers all knew of numerous instances of serious safety defects and quality issues reported by both end-line consumers and retail customers concerning the Company's products including its air fryers, juicers, and wafflizers. Tristar did nothing and misrepresented and concealed these problems to Spectrum, making the False RW&C that the Company complied with all applicable laws and regulations knowingly untrue. As well, Tristar and Kishore knew the Company's products were defective and/or of such a quality that they (a) failed to satisfy the Product Warranties and Contractual Commitments made to retail customers, and (b) were not salable in the ordinary course of business nor of sufficient quality to continue operating the business. Finally, Kishore and Tristar also knew that these safety and quality issues with the Company's products amounted to numerous Events of Default.

16. <u>These False RW&C Were Intended to—and Did—Induce Spectrum to Execute the MIPA and Pay the Purchase Price</u>: The False RW&C were made for the purpose of inducing Spectrum to buy the Company and take on the other obligations in the Ancillary Agreements.

a. *The Operations Misrepresentations*: For Spectrum, one fundamental aspect of the Acquisition was knowing that after the Closing, the Company was capable of continuing to operate in substantially the same manner as before the Closing. Tristar and Kishore knew that was not possible given fading demand for the products and excess inventory problems that were occurring at the same time as Spectrum's due diligence, but they went to extreme lengths to try to conceal their collapsing business, assure Spectrum, and convince it to buy the Company. If Spectrum learned the truth, Tristar and Kishore recognized, the Acquisition never would go through. So, it was essential for Tristar and Kishore to make it appear the Company was selling more—and generating more profit—than in reality, while telling Spectrum it was business as usual. After the Closing, when the Company returned to operating normally and truly was subject to GAAP, sales and profits plummeted.

b. *The Financial Statement Misrepresentations*: A second fundamental aspect of the Acquisition for Spectrum was that the Company was capable of continuing to generate tens of millions of dollars in positive EBITDA after the Closing. Fisher, Hendrick, and their direct reports recognized that meeting the projected financial performance communicated to Spectrum was essential to the Acquisition, and so they manipulated financials when lackluster results arrived month after month. They also searched for ways to "find" EBITDA and manipulated financial data given to Spectrum to "improv[e]" and "boost[]" the appearance of the Company's financial position. And when Spectrum questioned Tristar and Kishore during diligence, rather than provide truthful responses which would have unmasked the fraud, Tristar and Kishore affirmatively misrepresented and concealed Tristar's ruinous financial position, failing business, and unprecedented actions they had been taking, and

gave false assurances to the contrary. All of this deception fed directly into the Financial Statements and other financial misrepresentations in the MIPA.

c. *The Products Misrepresentations*: A third fundamental aspect of the Acquisition for Spectrum was the Company's ability to sell its products and maintain its business reputation and customer perception at the same level as before the Closing. The ability to continue selling the acquired Product Lines and Brands after the Closing was critical, and Tristar and Kishore thus knew Spectrum never would have bought the Company had it known the business it was acquiring was not operating in accordance with law and had experienced multiple Events of Default, and its products were defective, not salable in the ordinary course, in violation of the applicable Product Warranties and Contractual Commitments, and unable to support the represented sales revenues and profit margins.

17. Spectrum Suffered Tremendous Damages: The impact of this massive fraud on Spectrum and the Company was devastating. Tristar and Kishore hid that the Company in truth, at the time of the Closing, was worth just a fraction of what Spectrum paid based on its reliance on Tristar's and Kishore's False RW&C. And since the Closing, the Company's overall financial and operational performance, including its revenue, profits, and EBITDA, have continued to plummet to astonishingly low depths, causing substantial lost value to Spectrum due to the False RW&C as of the Closing. Spectrum thus has suffered hundreds of millions of dollars in losses, including more than ***$250 million*** in damages flowing from the False RW&C as of the Closing, for, among other things, (i) Spectrum's overpayment of the Purchase Price based on the False RW&C; (ii) the Company's diminished capacity to generate revenue going forward; and (iii) millions of dollars in other needless liabilities such as the Ancillary Agreements.

18. In short, the Company that Spectrum purchased was wholly different from and far inferior to the one it was led to believe it was buying. But for Tristar's and Kishore's frauds and the related assistance by Anjali, the Trusts, the Real-Estate Companies, and Sowers, Spectrum never would have entered into the MIPA or paid the Purchase Price to buy the Company.

**PARTIES**

19. Plaintiff Spectrum is a Delaware corporation with its principal place of business in Middleton, Wisconsin.

20. Defendant Tristar is a Florida corporation with its principal place of business in Santa Rosa Beach, Florida.

21. Defendant Kishore is a resident and citizen of Florida. Kishore is a minority shareholder in and the founder of Tristar. Kishore is also a trustee of Defendant AM Trust, a Florida trust and minority shareholder in Tristar. Kishore caused the Trusts to be formed as of December 31, 2021, for the purpose of receiving tens of millions of dollars in fraud proceeds from the Acquisition and avoid having to pay taxes on such gains. Kishore, as trustee of AM Trust, and AM Trust itself had knowledge of Kishore's scheme to defraud Spectrum and took action to encourage, assist, and enable Kishore's fraud against Spectrum. Among other things, Kishore caused AM Trust to provide, and AM Trust did provide, its written consent to and approval of the Acquisition, without which Kishore's fraud scheme could not have occurred. Kishore also caused AM Trust to receive, and AM Trust did knowingly accept and receive, tens of millions of dollars in ill-gotten gains from Kishore's fraud, which were siphoned out of Tristar soon after the Closing, frustrating Spectrum's ability to secure meaningful indemnity and recover its losses from Tristar.

22. Defendant Anjali is a resident and citizen of Florida. Anjali is a trustee of Defendant KM Trust, a Florida trust and minority shareholder in Tristar. Anjali caused the Trusts to be formed as of December 31, 2021, for the purpose of receiving tens of millions of dollars in fraud proceeds from the Acquisition and avoid having to pay taxes on such gains. Anjali, as trustee of KM Trust, and KM Trust itself had knowledge of Kishore's scheme to defraud Spectrum and took action to encourage, assist, and enable Kishore's fraud against Spectrum. Among other things,

Anjali caused KM Trust to provide, and KM Trust did provide, its written consent to and approval of the Acquisition, without which Kishore's fraud scheme could not have occurred. Anjali also caused KM Trust to receive, and KM Trust did knowingly accept and receive, tens of millions of dollars in ill-gotten gains from Kishore's fraud in connection with the Acquisition, which were siphoned out of Tristar soon after the Closing, frustrating Spectrum's ability to secure meaningful indemnity and recover its losses from Tristar. Anjali also was a "related party" whom Tristar and Kishore knowingly failed to disclose despite their representation and warranty they provided under Section 3.24 of the MIPA. There, Tristar and Kishore represented that no "immediate family member" of any Tristar stockholder, member, director, manager, or officer was "involved in any business arrangement or relationship with, or is party to any contract with," the Company, nor "owns any material property or right, tangible or intangible" used by the Company. This was another False RW&C. Anjali owned and/or controlled one or more of the Real-Estate Companies that owned Tristar's office and warehouse space, which Defendants induced Spectrum to agree to cause the Company to lease under the MIPA, to its detriment.

23. Defendant Sowers is a resident and citizen of Pennsylvania. Sowers is a trustee of Defendants AM Trust and KM Trust, each of which is a Florida trust and minority shareholder in Tristar. Sowers, as trustee of the Trusts, and the Trusts themselves had knowledge of Kishore's scheme to defraud Spectrum and took action to encourage, assist, and enable Kishore's fraud against Spectrum. Among other things, Sowers caused the Trusts to provide, and the Trusts did provide, their written consent to and approval of the Acquisition, without which Kishore's fraud scheme could not have occurred. Sowers also caused the Trusts to receive, and the Trusts did knowingly receive, tens of millions of dollars in ill-gotten gains from Kishore's fraud in connection

with the Acquisition, which were siphoned out of Tristar soon after the Closing, frustrating Spectrum's ability to secure meaningful indemnity and recover its losses from Tristar.

24. Defendant A&R is a New Jersey limited liability company. The members of A&R are Kishore and Anjali, both Florida residents. A&R had knowledge of Tristar's scheme to defraud Spectrum and took action to encourage, assist, and enable it, as further alleged herein.

25. Defendant Centre Avenue is a Delaware limited liability company. The members of Centre Avenue are Kishore, a Florida resident, and Sowers, a Pennsylvania resident. Centre Avenue had knowledge of Tristar's scheme to defraud Spectrum and took action to encourage, assist, and enable it, as further alleged herein.

26. Defendant Mt. Anderson is a Delaware limited liability company. The members of Mt. Anderson are Kishore, a Florida resident, Sowers, a Pennsylvania resident, and KM Trust. Mt. Anderson had knowledge of Tristar's scheme to defraud Spectrum and took action to encourage, assist, and enable it, as further alleged herein.

**JURISDICTION AND VENUE**

27. The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

28. The Court has personal jurisdiction over Tristar and Kishore because they agreed in the MIPA to "irrevocably submit[] to the exclusive jurisdiction of the . . . [U.S.] District Court for the District of Delaware . . ., for the purposes of any suit, action or other proceeding arising out of [the MIPA], any Document and any certificate delivered pursuant hereto or thereto."

29. The Court has personal jurisdiction over the Real-Estate Companies because the MIPA's "exclusive jurisdiction" provision applies to all "Document[s]," which is defined to

include the leases with the Real-Estate Companies, which were attached to the MIPA. The Real-Estate Companies were aware of this provision of the MIPA and that related disputes between the Real-Estate Companies and Spectrum would be subject to exclusive jurisdiction in Delaware. The Real-Estate Companies also are subject to this Court's jurisdiction under 10 Del. C. § 3104 due to their participation with Tristar in a conspiracy to defraud Spectrum as described herein. Substantial acts and effects of that conspiracy occurred in Delaware (e.g., Tristar's fraud in Delaware, which negatively impacted Spectrum (a Delaware corporation) and the Company (a Delaware limited liability company)); the Real-Estate Companies knew and/or had reason to know of those acts and effects and that any acts they took outside Delaware (e.g., leasing properties located outside Delaware as the result of Tristar's fraud) would have effects in Delaware (e.g., causing Spectrum and the Company harm in Delaware); and the acts and effects of the conspiracy in Delaware were a direct and foreseeable result of the Real-Estate Companies' conduct to further the conspiracy. Finally, Centre Avenue and Mt. Anderson are Delaware limited liability companies.

30. The Court has personal jurisdiction over Anjali, KM Trust, AM Trust, and Sowers under 10 Del. C. § 3104 due to their participation with Kishore in a conspiracy to defraud Spectrum as described herein. Substantial acts and effects of that conspiracy occurred in Delaware (e.g., Kishore's fraud in Delaware, which negatively impacted Spectrum (a Delaware corporation) and the Company (a Delaware limited liability company)); Anjali, KM Trust, AM Trust, and Sowers knew and/or had reason to know of those acts and/or effects and that any acts they took outside Delaware (e.g., arranging and providing approval for the Acquisition, which transaction was procured through Kishore's fraud on Spectrum, and receiving ill-gotten fraud proceeds from that Acquisition) would have effects in Delaware (e.g., causing Spectrum and the Company harm in

Delaware); and the acts and effects of the conspiracy in Delaware were a direct and foreseeable result of Anjali's, KM Trust's, AM Trust's, and Sowers's conduct to further the conspiracy.

31. Venue is proper because the MIPA contains an "irrevocabl[e] and un-conditional[] waiv[er of] any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement . . . in . . . the United States District Court for the District of Delaware."

## FACTUAL ALLEGATIONS

### I. Before 2021, Tristar's Business Model Operated According to a Recurring Plan.

#### A. The Company That Tristar and Kishore Sold to Spectrum.

32. Before Kishore sold off Tristar's primary assets, wired the hundreds of millions of dollars Tristar received from Spectrum into their own personal bank accounts and those of the Trusts, and funneled what little remained of Tristar into a different entity Kishore created, Tristar was an entity that sold kitchen appliances and home essentials.

33. While Tristar had a direct-to-consumer ("DTC") division which it used to stimulate initial demand for its products, its major sources of revenue were derived from selling inventory to large retailers.

34. The Company's main products were the air fryers, juicers, and wafflizers, which were sold under the Brands—the product lines Spectrum bought in the Acquisition (collectively, the "Product Lines").

#### B. Tristar's Carefully Negotiated and Planned Use of Promotions.

35. Before Kishore began trying to sell the Company, Tristar in the ordinary course of business used certain practices when selling its products to retail customers, including but not limited to (1) Discounts, (2) Opportunity Sales, (3) promises regarding Tristar's advertising and

marketing expenditures ("Advertising Expenditures"), and (4) Chargeback Agreements (collectively, "Promotions").

36. "Discounts" refers to when Tristar offered products to a retailer at a discounted price—for example, offering to sell products to a retailer for a price of $90 per unit rather than $100 per unit. "Opportunity Sales" refers to when Tristar would occasionally offer select discount retailers the special, one-time opportunity to purchase a large quantity of Tristar products in bulk for a low price. These Opportunity Sales consisted of old, obsolete inventory, not current models that a retailer would continually replenish in the future. With respect to "Advertising Expenditures," to convince Tristar's retail customers to purchase greater inventory, Tristar's sales representatives agreed with the retailers as to how much money Tristar would spend on advertising and marketing the products that fiscal year, on the expectation that substantial Advertising Expenditures would drive consumer demand for the products. Finally, "Chargeback Agreements" are when Tristar would sell products to a retailer at the full price on the front end, but agree that the retailer would offer that product to the end-line consumers in the future at a discounted price for a limited time (the "Chargeback Period"), and Tristar would cover all or part of the difference in the retailer's revenue earned as a result of each discounted sale achieved during the agreed Chargeback Period. For example, Tristar and the retailer might agree that the retailer would offer an air fryer to end-line consumers at a $30 discount for one week in November, and Tristar would fund the $30 discount for each unit sold during that week-long Chargeback Period. At the conclusion of the Chargeback Period, the retailer would determine the applicable number of units it sold to consumers during the Chargeback Period, multiply that number by the agreed-upon dollar amount Tristar would fund per unit, and invoice Tristar for, or deduct from a future invoice payment, the total amount Tristar owed in connection with the Chargeback Agreement.

37. Before the start of the Company's sale process, the terms of these Promotions were negotiated and mutually agreed upon by Tristar and the retailer at the time the retailer purchased the inventory from Tristar.

38. When a Tristar sales representative negotiated a Promotion, the representative prepared a Vendor Funding Form ("VFF") (or a similar email) reflecting the agreed-upon terms of the Promotion, and it was added to a Promotion calendar Tristar maintained (the "Promotion Calendar"). The Promotion Calendar identified the Promotions during each month of the year, and listed the specific terms that had been agreed-upon by Tristar and the retailer.

39. Tristar's basic theory for supporting its Promotion activities was that offering these Promotions would create buzz and excitement around the featured Tristar products, which would drive end-line consumer sales of the products at the retailers, and in turn cause the retailers to purchase more inventory from Tristar to meet the enhanced end-line consumer demand.

**C. Tristar's Accounting for Sales Dilution.**

40. To comply with GAAP and to fairly and accurately present a company's financial picture, a company's financial statements must accurately present the company's net revenue. For companies like Tristar, Dilution is a reserve on the financial statements that accounts for any factors that may reduce the amount of the company's overall gross sales, translating, in turn, into the total net dollar amount the company will realize from sales, i.e., its net sales. With respect to the business activities of Tristar, there were two ways Dilution could occur, both of which must have been accounted for in order for its Financial Statements to comply with GAAP—or, regardless of GAAP, to fairly and accurately present Tristar's and the Company's financial picture.

41. The first way Dilution could occur was as a result of Tristar's negotiated Promotions that were recorded on a VFF and submitted to Tristar's finance team ("VFF Dilution"). For

example, if Tristar sold $1,000,000 worth of products but provided $100,000 in funding for Promotions, the net sales would be $900,000, reflecting the Dilution of the sales amount.

42. At Tristar, VFF Dilution was typically elevated during Q3 of each calendar year, because that is when Tristar most heavily used Promotions to sell the retailers inventory in preparation for Black Friday and winter holiday sales—and thus, that is when revenue for those sales to retailers, and any corresponding Dilution, would be recognized. VFF Dilution typically reverted to lower levels in Q4.

43. The second way Dilution could occur was as a result of any other factors that may reduce gross sales, other than Promotions recorded on a VFF, such as product returns or post-hoc reductions in price demanded by retail customers due to a lack of consumer demand, product defects or non-conformities, or customer dissatisfaction ("Non-VFF Dilution"). Reserves for Non-VFF Dilution are necessary for, among other things, discounts, rebates, refunds, credits, price concessions, incentives, penalties, or other similar items that retail customers may demand. Without these stated and recorded Dilution reserves, there would not be an accurate picture of the Company's actual profitability.

**II. Knowing Profitability Would Fade, Kishore Began Trying to Unload Tristar.**

44. In or around August 2020, Kishore, on behalf of Tristar, engaged a third-party investment bank, Stifel Nicolaus & Co. ("Stifel"), to assist with identifying potential acquirers and selling a substantial portion of Tristar, which ultimately became a sale of the Company.

45. In November 2020, with Stifel's assistance, Kishore, Fisher, and Hendrick began preparing a Confidential Information Memorandum ("CIM") to present to potential acquirers.

46. The final version of the CIM reflected that Tristar and Kishore purported the Product Lines, through the Company, to be capable of achieving the following impressive results:

| | Net Sales | Gross Profits | EBITDA |
|---|---|---|---|
| **2021** | $603 million | $187.5 million | $95 million |
| **2022** | $663 million (a 10% YoY[3] increase) | $207 million (a 10% YoY increase) | $107 million (a 13% YoY increase) |
| **2023** | $728 million (a 10% YOY increase) | $231 million (a 10% YOY increase) | $113 million (a 6% YOY increase) |
| **2024** | $795 million (a 9% YOY increase) | $256 million (a 10% YOY increase) | $119 million (a 5% YOY increase) |

47. Tristar and Kishore understood the importance of the Company's financial performance to a satisfactory sale. Among other things, Kishore told Hendrick that the "most important" thing for purposes of achieving a sale of the Company was to meet the numbers in the CIM.

48. Tristar and Kishore, however, knew that storm clouds were brewing and that Tristar would not be able to achieve the figures in the CIM, given Tristar's falling sales. In 2021, for example, Hendrick and one of his direct reports discussed in writing their shared concerns and doubts about Tristar's ability to meet these figures.

49. Kishore was undeterred. Notwithstanding Tristar's falling sales, Kishore directed Stifel to solicit offers from potential purchasers using the rosy financial figures in the CIM.

50. After several months, Tristar received at least one offer from a potential purchaser—totaling hundreds of millions of dollars—but Kishore wanted more money. He thus directed Stifel to contact additional potential buyers, which ultimately included Spectrum.

[3] "YoY" refers to year over year.

**III. Contacted by Tristar About a Deal, Spectrum Conducted Extensive Due Diligence.**

51. Acting on Kishore's orders, Stifel contacted Spectrum to solicit interest in potentially buying a substantial portion of Tristar. On June 19, 2021, Spectrum executed a Non-Disclosure Agreement ("NDA") to facilitate deeper discussions with Tristar and Kishore.

52. Kishore, Hendrick, and Fisher had the CIM presented to Spectrum in August 2021, which, given the reported performance metrics and forecasted growth of the Company, piqued Spectrum's interest and willingness to move forward with the sales process.

53. On November 13, 2021, based on what Tristar and Kishore had disclosed to that point, Spectrum executed a letter of intent and thereafter carried out extensive due diligence.

54. In addition to performing its own review through various internal teams including finance, accounting, operations, legal, sales, and quality, Spectrum engaged top-tier independent advisors, including world-renowned law and accounting firms, which conducted their own extensive diligence. Based on the information provided by Tristar, Spectrum's accounting firm generated a buy-side Quality of Earnings Analysis—assessing the Company's capacity to generate the represented financial metrics on a recurring basis—to evaluate the Acquisition.

55. Over a several months-long diligence period, Spectrum reviewed thousands of Tristar-provided documents and information (including through a data room) and held numerous meetings and calls with Tristar's executives and employees, including Kishore, Fisher, and Hendrick. The similarities between Spectrum's business to Tristar's business—i.e., both produced small kitchen appliances sold at retailers—made Spectrum especially well-suited to this diligence effort. Spectrum posed multiple rounds of detailed questions to gain a comprehensive understanding of the business and identify and assess all potentially relevant risks. This included specific questions

which, had Tristar and Kishore not misrepresented and concealed the truth, would have revealed the extent of their fraud and the significant challenges the Company was facing.

56. For example, Spectrum noticed that certain of Tristar's retail customers appeared to have a somewhat elevated level of on-hand inventory of certain non-core products and raised specific requests and questions about inventory levels more broadly to Tristar, including:

a. "[P]rovide the monthly demand and inventory in dollars, by category and brand."

b. Sales are "down YOY in the first half, but showing strong growth in back half. What are new listings? What is POS assumption?"

c. "Please help bridge/understand the 2022 revised Q1 against the prior forecast . . . . How much is inventory overhang at retail?"

57. Rather than disclose the truth, Tristar and Kishore told Spectrum these inventory levels were just short-lived episodes owing mainly to run-of-the-mill conditions such as retailers having "loaded orders early" or "time shift" (i.e., deliveries to retail customers were later than expected due to shipping delays). Contrary to anything problematic, Tristar said the retailers were "currently selling through inventory" and would continue to do so without any extraordinary measures (including VFF- and Non-VFF Dilution), and this did not pose a problem to the business's operations and ability to continue selling inventory to the retail customers.

58. Spectrum also asked specific questions concerning Tristar's accounting practices, including to confirm that the Financial Statements were true, correct, and complete, fairly presented in all material respects the financial position and results of operations of Tristar and the Company, and were prepared in conformity with GAAP, as is typically represented and warranted in a transaction such as the Acquisition. Spectrum also asked specific questions to confirm Tristar's Dilution reserves were accurate and sufficiently captured all liabilities. This issue became especially important when Tristar initially declined to agree to a representation and warranty that

the Financial Statements complied with GAAP, which prompted a series of discussions resulting in Tristar and Kishore agreeing to the GAAP representations and warranties in Section 3.8 (subject to certain delineated exceptions unrelated to dilution). Among others, Spectrum asked Tristar:

a. To provide "[c]ommentary on accounting policies/practices, any non-GAAP accounting policies."

b. "What are your one-timers in dilution in 2021 that won't repeat in 2022?"

c. How much of Tristar's gross profit projected for Q1 2022 "is due to expected markdowns or other corrections for inventory on hand after holiday at retail?"

d. "Please could you walk us through the methodology associated with the monthly accrual changes that sit within dilution?"

e. "Please confirm what markdowns are currently accrued for Calendar 2022?"

59. In response, Tristar assured Spectrum that the Financial Statements complied with GAAP and fairly and accurately presented Tristar's and the Company's financial picture. Tristar also explained that its Dilution reserves were sufficient and GAAP compliant and claimed that no additional Dilution needed to be accrued, including because any price adjustments or returns requested by the retail customers in the future would be minimal and not material. Tristar also was adamant that any existing levels of inventory at the retailers would be sold through with minimal assistance from Spectrum post-Closing. And to be sure, Fisher himself assured Spectrum that Tristar already budgeted sufficient Dilution in the 2022 forecast presented to Spectrum to cover all Promotions in Q1 2022 and Q2 2022. These responses allayed any concern over Tristar's inventory levels and Dilution accounting, but to be conservative, Spectrum internally assumed an additional $5 million reserve for Dilution in 2022.

60. Spectrum also asked questions concerning the quality and salability of the products Spectrum would be acquiring, including to confirm there were no concerns about product defects, product quality, or any hinderance to meeting all express and implied warranties, and that the

Company remained in compliance with all contracts. Spectrum also asked questions to confirm that the Company complied with all applicable laws and its obligations to its main regulator, the U.S. Consumer Product Safety Commission ("CPSC").

61. In response to Spectrum's questions, Tristar stated that there were no concerns regarding product quality nor the ability to meet all requirements of all applicable law or under the Company's current contracts with the retail customers for the foreseeable future, and neither Tristar nor Kishore disclosed any issues with dual basket air fryers, juicers, or wafflizers, despite Tristar's pre-Closing receipt of substantial complaints and reports about those products, as further described below. Moreover, Tristar did not provide customer complaint data to Spectrum before the Closing, further evidencing its efforts to knowingly hide damaging information related to product quality and safety.

62. Based on the information about Tristar and the Company that was made available to Spectrum, including their represented financial performance, Spectrum prepared a valuation model to calculate a value for the Company and thus an appropriate purchase price for the Acquisition. Spectrum, Kishore, and Tristar ultimately agreed on the $325 million Purchase Price, with a $125 million earnout payable to Kishore over two years if the Company met certain gross profit targets during that time. Kishore readily agreed to receive this $125 million over time rather than with the Purchase Price, further relaying to Spectrum the financial strength of the Company and reaffirming the purported accuracy of Tristar's and Kishore's disclosures in diligence, as well as their representations, warranties, and covenants in the MIPA. As a condition of the Acquisition, KM Trust and AM Trust provided their approval for the Closing to occur, which were procured by Anjali, Kishore, and Sowers, with knowledge of Kishore's fraud scheme. Without such approval, the Closing, which happened on February 18, 2022, could not have occurred.

## IV. Tristar and Kishore Intentionally Lied and Took Actions to Deceive Spectrum and Prevent It from Discovering the Truth, to Induce Spectrum to Buy the Company.

63. As discussed above, Tristar and Kishore made at least 14 false representations, warranties, and covenants in the MIPA. While each of these False RW&Cs constitutes an independent fraudulent act, they collectively reflect a coordinated scheme to overinflate the financial condition of the Company to induce Spectrum to buy it. All the conduct behind the False RW&C was intended to, and did, misrepresent and conceal Tristar's true business condition, including its tumbling sales, inaccurate Financial Statements, undisclosed liabilities, failing internal accounting controls, a business that was not operating in the ordinary course or in compliance with law and was experiencing Material Adverse Effects, products that did not conform to Product Warranties and Contractual Commitments and had defects, and numerous Events of Default. In short, they conveyed the false impression of a healthy business that would continue to operate after the Closing in substantially the same way it had operated before the Closing.

64. For simplicity, as described earlier, the False RW&C can be grouped as the Operations Misrepresentations (discussed in Paragraphs 65 to 96), the Financial Statement Misrepresentations (discussed in Paragraphs 97 to 126), and the Products Misrepresentations (discussed in Paragraphs 127 to 150).

### A. The Operations Misrepresentations: Contrive Sales at Practically Any Cost.

65. By June 2021, Tristar had begun missing its monthly sales forecasts, and the misses continued month after month. The sales process was taking longer than Kishore expected, and he knew he needed to take extraordinary measures to succeed in dumping the Company.

66. By October 2021, no such sale had occurred, and Tristar was facing a serious problem. Tristar had encouraged its retail customers to heavily purchase large amounts of inventory on the promise that end-line consumer sales would continue growing. But far from what Tristar

told Spectrum it expected, end-line consumers were purchasing much less of the products, and the retailers were thus overstocked with excess, slow-moving Tristar inventory they could not sell. With end-line consumer demand for Tristar products so low, the retail customers had no need to replenish their inventory supply (i.e., make additional purchases from Tristar).

67. In Q3 2021, Tristar missed its forecasted quarterly sales of PowerXL and Emeril Lagasse products to its two largest retail customers by a staggering $27 million—a monumental miss of nearly 5% of Tristar's expected revenue ***for the entire year*****.**

68. Tristar's employees alerted Kishore numerous times of the retail customers' soft sales to end-line consumers and inventory levels, including by specifically warning them in writing. Among other warnings, on November 3, 2021, Fisher emailed a line graph to Kishore and others to illustrate the dramatic nosedive in "POS sales" (i.e., sales to end-line consumers) of Tristar's top five most popular items at its largest retail customer ("Largest Retail Customer"):

**From:** Matthew Fisher <matthewf[redacted]
**Sent:** Wednesday, November 3, 2021 4:29 PM
**To:** Luigi Tartara <luigit[redacted]>; Jane Gilmartin <janeg[redacted]>; Anjali Mirchandani <angelai[redacted]>; David Kugielsky <davidk[redacted]>; Keith Mirchandani <keithm[redacted]
**Cc:** Ed Hendrick <ehendrick@tristarproductsinc.com>; Mark Rosen <mrosen[redacted]
**Subject:** POS Trend fo top 5 items at [redacted]

We made a chart of our sales at [redacted] over the year and when we had the price change. The biggest effect was a decline in sales on the 5QT Vortex unit. The bigger impact was in May time period during summer which we never really recovered from.




69. And on November 19, 2021, a Tristar analyst raised to Kishore (and Anjali) his concerns about excess inventory at the retailers, warning: “the sell-through isn’t as strong as last year and inventory levels at the retailers are likely higher right now in comparison to last year.”

70. Tristar and Kishore (as well as Anjali) thus knew the Company’s sales revenue would continue to plummet under these conditions, and they were panicking.

71. At Kishore’s instruction, Tristar’s leadership, including Fisher, Hendrick, and others, took actions during the period leading to the Closing—and especially Q4 2021 and Q1 2022—to conceal the tumbling demand for Tristar’s products by instructing the sales team to convince the retailers to keep purchasing inventory from Tristar despite the retail customers’ existing excess inventory and the absence of demand, all of which was concealed from Spectrum.

72. On October 8, 2021, Hendrick emailed Kishore regarding Tristar's plan to artificially increase the financial performance of the Company by instructing Tristar's sales team to offer increased Opportunity Sales of excess inventory, and by inaccurately recording and "adjust[ing]" Dilution on the financials:

**To:** Keith Mirchandani[keithm[redacted]
**From:** Ed Hendrick[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=USER3CD7F8BF]
**Sent:** Fri 10/8/2021 5:18:54 PM (UTC)
**Subject:** forecast

Keith - just a quick update. Our review of forecast yesterday added about $19 million in sales and $4 million to bottom line. We have an EBITA of $76 at the moment for the brands. We are targeting to get it to $81m. Matt/Luigi/David ares reviewing some possible Q4 opportunity sales where we have some excess stock. Between some of those and some smaller adjustments to dilution and overhead we will get to the $81 target for purpose of the revised forecast. I am going to weigh November a bit higher than October due to potential delivery issues. We will be approx $630 million gross sales and $81 million EBITA for the revised forecast to Nigel.

We are going to really have to push the sales group to hit these Q4 revenue forecasts.

Ed

73. As Hendrick reported in this update to Kishore, Tristar would "really have to push the sales group to hit the[] Q4 revenue forecasts" it gave to Spectrum, highlighting that Kishore knew the forecasts were inflated and the considered nature of the fraud scheme.

74. The first step in that scheme was to increase the sales team's internal forecasts, which were targets the sales team had to meet each month. This change coming from the leadership of Tristar resulted in heightened pressure on the Tristar team to achieve more sales than normal given the retail customers' excess inventory and lack of demand. The second step was to instruct the sales teams to use whatever means necessary to achieve the inflated forecasts, including by way of the non-ordinary-course practices described below. And the third step was to take all actions necessary to conceal the unavoidable consequences. Each step is discussed in further detail below.

Step One: Apply Heightened Pressure on the Sales Team
by Increasing Their Sales Targets Despite Plummeting Demand

75. The same day as Hendrick's October 8, 2021 email to Kishore regarding the plan to inflate the financial performance of the Company, Fisher and Hendrick sent the sales team an updated forecast setting forth the amount of inventory Tristar was going to sell to its Largest Retail Customer over the next few months (i.e., before the Closing). The document showed two targets: (i) Tristar's prior forecasted sales volumes to the Largest Retail Customer, and (ii) Tristar's revised forecasted sales volumes to the Largest Retail Customer. The revised forecast was significantly higher than the prior forecast and directly contradicted other discussions internally at Tristar centering around the facts that the Largest Retail Customer already had excess inventory, demand was falling, and the Largest Retail Customer did not have any need to buy more.

76. In fact, that same month, Tristar's sales representative in charge of the Largest Retail Customer account expressly commented to Fisher that they "may not make numbers . . . given sales rates." Fisher admitted, "I know. It's like quantum mechanics math. I need the math to bend the rules." A couple of weeks later, Tristar's inventory planner for the Largest Retail Customer (a direct Fisher report) (the "Inventory Planner") told Fisher, "there's NO way I believe we are going to have a $50M month this month" because the "[Largest Retail Customer's] orders ***are almost non-existent***." She was "honestly FREAKING OUT" because there was no way Tristar could meet the inflated projections.

77. Tristar likewise inflated the sales forecasts for the other retail customers to push the sales team to keep making more sales. For example, during the middle of October 2021, Tristar added $1 million in sales to the forecasts for its retail division, and Tristar likewise added an additional $2 million in sales to the retail division sales forecasts in the middle of November 2021—unusual conduct given the ongoing excess inventory and falling demand problems that caused

confusion and frustration among the sales team. When sales team members raised their concerns and objections to Tristar's Finance Manager (a direct Hendrick report) (the "Finance Manager"), the Finance Manager confirmed that Hendrick had instructed her to increase the forecasts "as a push pretty much to get to the [higher] sales numbers." Separately, Tristar's Retail Analyst and Operations Manager (the "Operations Manager")—another direct report of Fisher—noted that "[t]he stuff [the finance team] added [to the sales forecasts] pisses me off because it's not happening at all so what's the point of adding it!" The Operations Manager also observed that Tristar's finance team was "forcing sales that are not happening and don't freaking apply."

78. The only explanation for this unusual conduct, exemplified by Hendrick's October 8, 2021 email, is Kishore's drive to sell the Company for as much money as possible despite dramatically falling demand and excess inventory at the retailers. And it was with that email at the latest, along with many others sent around that same time—culminating in drastically pushing the sales team's Q4 sales targets far higher than could be reasonably achieved if the Company were to operate in the ordinary course—that Tristar's and Kishore's effort to hide the Company's plummeting demand from Spectrum began. That laid the groundwork for Step Two of the plan.

<u>Step Two: Instruct the Sales Team to Use Whatever Measures Necessary to Achieve Their Increased Sales Targets</u>

79. On October 11, 2021, Fisher held a meeting with Tristar's sales representatives (who reported to him) about "Q4 Opportunity Sales." Fisher instructed the sales representatives to convince Tristar's retail customers to purchase more products from Tristar despite the retailers' existing excess inventory and reluctance to purchase more given the falling demand.

80. To stimulate more sales of inventory in Q4 2021 and Q1 2022 than otherwise would have occurred in the ordinary course of Tristar's business, the sales team was instructed to diverge from the carefully planned and negotiated Promotion Calendar, including by (1) offering the retail

customers unprecedented Discounts, (2) increasing the frequency and magnitude of Opportunity Sales, (3) promising retail customers higher Advertising Expenditures, and (4) enhancing and adding Chargeback Agreements.

81. *Offering Unprecedented Discounts*: During this time, Tristar offered deep Discounts in order to sell products to the retail customers. These sales were at far lower prices than those Tristar typically would agree to, especially during Q4 of a calendar year, when demand historically was high and deep Discounts thus unnecessary to induce sales.

82. For example, in October 2021, Tristar's national sales manager and Fisher's direct report (the "National Sales Manager") offered extremely deep Discounts to another retail customer for 40,000 air fryers and wafflizers that were "active models but heavy on inventory going into Q4 so they can be offered at deep discounts." Tristar first offered these products at a 50% Discount, but the retailer refused on account of its excess inventory and stated it would purchase the products only if Tristar gave even more "aggressive price points." Tristar was desperate to get products "out of the warehouse fast" and therefore agreed to an extraordinary Discount. It was not Tristar's historical practice to offer such large Discounts, yet Tristar continued to increase the amount of the Discounts offered to retail customers to maximize sales almost irrespective of margin.

83. *Increasing Frequency and Magnitude of Opportunity Sales*: Tristar also manufactured sales during this time by offering more Opportunity Sales than it ordinarily did, and by deepening the Discount of the Opportunity Sale. Some of Tristar's Opportunity Sales during Q4 2021 and Q1 2022 were so deeply Discounted that Tristar made almost no profit from the sale.

84. For example, in early 2022, Tristar offered an unprecedented Opportunity Sale to a large retail customer for 65,000 units of air fryer grills for only $83.00 a unit, a massive Discount when compared to Tristar's ordinary price of $100.00 to $110.00. At the retailer's insistence, in

addition to the massive Discount, Tristar agreed to give the retailer $500,000 for an “additional [P]romotion.” While Tristar sold a large amount of inventory through this Opportunity Sale, the unusual Discount and additional funding reduced Tristar’s profit to only $0.46 per unit, which was far from Tristar’s customary practice.

85. *Promising Higher Advertising Expenditures*: Additionally, Tristar convinced retail customers to buy more inventory by promising that Tristar would spend millions of dollars on advertising and marketing the products to drive end-line consumer sales—while, at the same time, budgeting lower Advertising Expenditures internally and in the data presented to Spectrum.

86. For example, Tristar promised its retail customers that, post-Closing, the Company would spend at least $110 million in 2022 in advertising to drive end-line consumer sales. But that was not what Tristar told Spectrum. In the data Tristar provided to Spectrum regarding the Company’s post-Closing financial plan, Tristar reported a total of only $81.7 million in advertising spend for 2022—$28.3 million less than Tristar’s pre-Closing promises to retail customers.

87. *Enhancing and Adding Chargeback Agreements*: Finally, Tristar increased and changed its usage of Chargeback Agreements with retailers. Where normally Chargeback Agreements were negotiated and planned with the retail customers approximately three to six months in advance (or more) of the Chargeback Period, Tristar diverged from its ordinary-course practices in at least Q4 2021 and Q1 2022 by offering substantially more and deeper Chargeback Agreements than it had in the past with Chargeback Periods that took almost immediate effect. For Chargeback Agreements already agreed to, Tristar deepened the discount the retailer would offer to end-line consumers and increased the amount of Tristar’s agreed funding (for example, Tristar would change a $30 discount to a $40 discount), and/or (b) elongated the previously agreed Chargeback Period (for example, Tristar would change a one-week Chargeback Period to a two-

week Chargeback Period). In addition, Tristar added new, unplanned Chargeback Agreements that were not previously on the Promotion Calendar at all.

88. For example, in November 2021, Tristar's Executive Vice President of Sales and Fisher's direct report (the "VP of Sales") used Chargeback Agreements (in addition to extraordinary Discounts) to book increased sales Tristar otherwise would not have made. He increased the amount of Tristar's funding in connection with several previously planned Chargeback Agreements and added new Chargeback Agreements which were not on the Promotion Calendar at all.

89. By taking these unprecedented actions, which departed from Tristar's historical ordinary sales practices, Tristar managed to record tens of millions of dollars in more sales than it would have if the Company were operating normally. It did so for the purpose of making enough sales in at least Q4 2021 and Q1 2022 to mask Tristar's collapsing business until the Closing, when the Company would be dumped on Spectrum.

Step Three: Cover Up the Unavoidable Consequences of Tristar's Non-Ordinary-Course Sales Tactics

90. Tristar and Kishore knew these non-ordinary-course practices were exacerbating the retail customers' excess inventory problem, and that the retail customers would not be able to sell through it all normally.

91. And Tristar and Kishore knew that, faced with the unprecedented excess Tristar inventory, the retailers would: (1) stop, or drastically decrease, their purchases from the Company, (2) demand that the Company take the products back, and/or (3) demand that the Company agree to fund new Promotions. Tristar and Kishore knew these negative measures were unavoidable given the excess inventory, especially since, in practice, suppliers bear the bulk of the financial risk if retailers cannot sell inventory to consumers.

92. In fact, Tristar had already begun receiving such complaints and demands from retail customers before the Closing—none of which was disclosed to Spectrum. A few examples of these demands that were not disclosed to Spectrum are:

a. In December 2021, one retail customer notified Tristar that "[d]ue to poor performance, we are extending the promotion on the Air Fryer Combo until Sunday. Please confirm funding. In addition, the performance of this item was the worst we have ever had in this category for an event. We now have excessive amounts of inventory. Please provide a plan to exit this item."

b. Around the same time in December 2021, another retail customer refused to purchase inventory Tristar was trying to sell it, stating that "based on supply levels . . . there isn't a major need at the moment," and the retailer "first need[ed] to work through backlog" before it could consider purchasing more inventory. Accordingly, the retailer advised that the "best path forward" would be to "map out some promotions and volume assumptions to work through [the] inventory" already on the retailer's shelves.

c. Before the Closing in February 2022, Tristar offered an Opportunity Sale of 40,000 air fryers to another retail customer, but the retailer complained that it already had "46 weeks of supply" on hand, when it "shouldn't ever have more than 15-17 weeks of supply on hand." Tristar agreed to pay the retailer $227,000 to markdown and sell through the retailers' excess Tristar inventory on hand, so that the retailer, in turn, would purchase the additional 40,000 air fryers Tristar offered.

d. Similarly, yet another of Tristar's retail customers complained that it was "drowning in excess inventory and need[ed] some assistance getting out of these goods" and asked for Tristar's support to "limit the bleeding"—i.e., a credit for the profit it would lose by marking the products down enough to sell them.

93. In other words, the effect of Tristar's sales tactics in at least Q4 2021 and Q1 2022 to push retail customers to keep buying inventory in excess of demand—incredibly, when those same retail customers already were in severe excess inventory conditions—was that the retail market was even further flooded with Tristar's products, the distribution channels were further saturated, and relative demand for the products was driven down even more. This cycle, in turn, resulted in yet further non-ordinary-course sales tactics by Tristar, compounding the problem.

94. The result was that, after the Closing, retail customers (1) demanded that Spectrum honor a substantial volume of undisclosed promises for Promotions from Tristar's sales representatives pre-Closing, and (2) demanded that Spectrum accept the return of substantial quantities of products that Tristar had sold them and/or provide additional Promotions in an effort to address the retailers' inability to sell through the excess inventory—regardless of whether there ever had been an explicit agreement with Tristar. Millions of dollars in such demands—all of which were undisclosed to Spectrum as of the Closing—rolled in after the Closing, leaving the Company with no reasonable choice but to comply with the retail customers' demands. And, even after the Company gave all these concessions, some retailers still stopped buying and/or ultimately delisted certain of the Company's products, and the Company still experienced long-term harm to its relationship with the retailers.

95. In sum, Tristar and Kishore knew that the representations, warranties, and covenants in at least Sections 3.9(a), 3.9(b), 3.18, and 3.22 of the MIPA were false as of the Closing. At Kishore's instruction, Tristar took actions in Q4 2021 and Q1 2022 to knowingly induce the retail customers to purchase products far in excess of actual retailer and end-line consumer demand by using sales tactics including (1) offering the retail customers unprecedented Discounts, (2) increasing the frequency and magnitude of Opportunity Sales, (3) promising retail customers higher Advertising Expenditures, and (4) enhancing and adding Chargeback Agreements. Tristar took these actions, which departed from Tristar's historical practices, for the purpose of misrepresenting and concealing from Spectrum the declining demand for Tristar's products, the extent of the excess inventory problem, and the Company's diminished capacity to generate revenue going forward, to induce Spectrum to buy the Company.

96. In addition to placing the Company's business outside the ordinary course, these sales tactics also resulted in saturated channels and substantially depressed retailer and end-line consumer demand, which in turn rendered the products insufficient for the continued conduct of the Company's business post-Closing in substantially the same manner as before Closing, amounted to Events of Default, and had a Material Adverse Effect on the Company.

**B. The Financial Statement Misrepresentations: Hide the Unusual Sales Tactics.**

97. In addition to the above, to hide the declining financial performance of the Company and Tristar's reliance on the unusual practices described above to manufacture sales, Tristar and Kishore also inaccurately accounted for at last two key metrics on the Financial Statements presented to Spectrum. First, they misrepresented and concealed Tristar's true Dilution, which was unusually high leading up to the Closing given Tristar's declining demand and excess inventory problems. Second, they misrepresented and concealed Tristar's true financial picture by making ad hoc adjustments to the Financial Statements to overstate sales revenue and EBITDA and otherwise improperly account for excess inventory. Moreover, to further misrepresent and conceal the Company's true financial condition, Tristar and Kishore deceptively put millions of dollars of purchase orders on hold as a tactic to avoid recording those liabilities which ultimately came to light when the Company's suppliers demanded payment after the Closing.

**1. Tristar Knowingly Failed to Accurately Record Dilution.**

98. Again, in Q4 2021 and Q1 2022, Tristar was offering dramatically increased Promotions to retailers at a feverish pace to hit the sales numbers given to Spectrum, which (under GAAP and otherwise) causes higher Dilution, which in turn, reduces net sales.

99. But Tristar and Kishore needed to conceal these non-ordinary-course practices and pump up net sales—and thus EBITDA—as high as possible so Spectrum would buy the Company. Thus, Tristar also failed to accurately record all its Dilution, as required under GAAP.

100. Tristar knowingly did not accurately record dilution in at least two ways.

101. ***First***, Tristar knowingly understated its VFF Dilution, because it knowingly failed to account for a number of the agreements Tristar's sales representatives had struck with the retail customers in at least Q4 2021 outside the ordinary course. For example, on December 22, 2021, a Tristar retail customer emailed Tristar's VP of Sales memorializing the "funding plan" they had reached, which included substantial additional Promotions to run in December 2021 and January 2022 outside of those that had previously been earmarked in the Promotion Calendar. The retailer confirmed it required this funding because it had not been able to sell through its excess Tristar inventory and it "need[ed] it off the [sales] floor." This funding agreement, however, was not reflected on Tristar's Financial Statements.

102. ***Second***, Tristar knowingly understated its Non-VFF Dilution, because it knowingly failed to account for the discounts, returns, and other price adjustments and financial accommodations retail customers would continue to demand after the Closing to enable them to try to sell their excess inventory, and as remediation for the unusually high consumer returns due to the poor-quality and unsafe products, which Tristar and Kishore were aware of but did not disclose to Spectrum, as further described below.

103. Tristar and Kishore knew Dilution reserves were understated as a result.

104. Before the Closing, Tristar employees raised warnings as to the retailers' excess inventory to Kishore, and Tristar's sales and finance teams expressly acknowledged the retail customers' excess inventory and the anticipated need to provide Promotions and other price

adjustments and financial accommodations in the future, and in fact, as described above, Tristar had already begun receiving such demands before the MIPA was even signed. Yet Tristar and Kishore knowingly did not disclose these circumstances or the resulting Dilution and liabilities.

105. Moreover, Tristar's finance team was well aware before the Closing that Dilution had reached unprecedented levels. Tristar's Dilution for PowerXL typically was around 12-15%; however, remarkably, that same Dilution in the retail division was 50.4% in January 2022, which figures do not even include the massive Non-VFF Dilution which Tristar knowingly failed to record. And making matters worse, Tristar nonetheless told Spectrum that Dilution would be only 16.7% or less throughout the entirety of 2022, even though that was a near impossibility given Tristar's undisclosed extraordinary sales tactics at the time.

106. This failure to accurately record Dilution meant the Financial Statements were wrong and not GAAP-compliant, and that the Company had liabilities that were not reflected in the Financial Statements, contrary to Tristar's and Kishore's False RW&Cs. It also meant that Tristar's accounting controls were woefully deficient, despite Tristar's and Kishore's False RW&C that Tristar maintained sufficient accounting controls and had not received any material complaints regarding any such deficiencies. In fact, a Tristar employee did raise written concerns over Tristar's internal controls for Dilution, warning on January 12, 2022, that "the vendor funding forms only capture markdowns and ad allowances . . . if the customer deducts what we estimate," making them "***[n]ot a good tool for dilution***" (emphasis added), even though such "forms" were the only "tool" Tristar used to track Dilution. Moreover, Tristar had no controls at all to track, capture, or quantify Non-VFF Dilution. Thus, Tristar's lack of controls left a large gap for omission of even VFF Dilution, both in scale and frequency, from Tristar's books and records, not to mention Non-VFF Dilution, which Tristar insisted before the Closing was a non-issue. This was

a material deficiency that Tristar and Kishore knew about, but nonetheless no action was taken to correct or disclose it.

107. Sure enough, after the Closing, Spectrum was faced with retail customers complaining about excess inventory Tristar had sold them and the excessive amounts of consumer returns due to the products' poor quality and defects. And as Tristar and Kishore knew would happen, the retailers demanded millions of dollars in Promotions and other price adjustments and financial accommodations to enable them to try to sell this excess inventory and to remediate the problems caused by the quality and defect concerns. Tristar and Kishore never told Spectrum about these liabilities, nor were they reflected in Tristar's Financial Statements, which were represented and warranted as complying with GAAP.

108. After the Closing, Spectrum confronted Tristar with these demands and sought a purchase-price adjustment under the MIPA to account for millions of dollars' worth of unrecorded Dilution that Tristar and Kishore had not disclosed and were not properly recorded on Tristar's Financial Statements.

109. Tristar, Kishore, and its third-party auditor, RKL LLP ("RKL"), admitted that Tristar's Dilution reserve on Tristar's Financial Statements as of the Closing should have been about $26.9 million in total, resulting in, among other things, an overstatement of the Company's 2021 net sales by $9.9 million. Tristar thus agreed to a post-Closing purchase-price adjustment for only the dollar-for-dollar impact of that unrecorded Dilution, without also paying Spectrum for its negative impact on the Company's value as of the Closing resulting in an inflated Purchase Price or the other Losses these tactics caused to the Company.

110. As a result of further investigations into Tristar's financials, Spectrum subsequently discovered at least an additional $11.7 million in Dilution for 2021 (above the $9.9 million) that

was required to be, but was not, reserved at the Company as of the Closing, which further inflated its value and the Purchase Price and caused millions of dollars in damages to Spectrum. Tristar has never compensated Spectrum for these losses.

#### 2. Tristar Knowingly Made Ad Hoc Adjustments to the Financial Statements Presented to Spectrum.

111. Further knowingly misrepresenting Tristar's financial position, Tristar reduced Dilution and other expenses on the Financial Statements by making manual, ad-hoc adjustments.

112. For example, on January 11, 2022, Tristar's then-assistant controller ("Assistant Controller"), circulated Tristar's December 2021 profit and loss statement ("P&L") to Hendrick, Tristar's Finance Manager, and others, which showed a loss of $10.5 million.

113. The Assistant Controller noted that this loss was attributable to three main things: 1) an unexplained $4.5 million payment to Kishore, 2) December's accounts receivable reserves were increased by $3 million, and 3) Tristar was $4 million over budget on media spending.

114. Instead of requesting that Tristar's accounting team double check the numbers and ensure the accuracy of the report, Hendrick plainly and deliberately instructed the finance team to lower Tristar's reserves, to "find . . . some media [expenses] to defer[]" into later months financial statements "so we can improve December," and to reduce royalty accruals.

115. After several drafts aimed at further improving the appearance of Tristar's financial results, Tristar's Assistant Controller circulated on January 18, 2022, the final December P&L along with a spreadsheet listing the adjustments that had been made, which included, among other things, significant large, round-sum reductions to Dilution, deferrals of media expenses, and reductions to royalty payments, all of which artificially inflated EBITDA.

116. As reflected in Tristar's internal emails, these changes to the December P&L, including its reduction of dilution, were for the purpose of "boosting" December's represented

financial numbers, which were then included in the Financial Statements. These accounting practices used to prepare the Financial Statements did not comply with GAAP and did not fairly present the financial position and results of the operations of the business.

117. In addition to rendering the Financial Statements false and not GAAP-compliant, Tristar's improper deferral and reduction of expenditures that were necessary for the future performance of the Company, such as expenditure for advertising, marketing and new product development, harmed the earning capability of the Company following the Closing.

**3. Tristar Deceptively Put Millions of Dollars of Purchase Orders on Hold.**

118. Yet another puzzle piece in Tristar's and Kishore's coordinated effort to misrepresent and conceal the true financial condition of the Company was to instruct Tristar's third-party suppliers, which were based oversees, to not ship the Company products they already had manufactured per Tristar's prior purchase orders. Tristar instructed suppliers to either place the shipments on hold or cancel them entirely, regardless of whether the products were already work in progress, complete, or ready for shipment to Tristar or the retailers directly. Doing so, however, did not eliminate that Company's ultimate responsibility for ultimately accepting the goods and paying for them, likely at a time when demand for the products had eroded even further.

119. Delaying these shipments of inventory advanced at least three of Tristar's and Kishore's fraudulent goals: (i) it prevented the accumulation of even more excess inventory on top of the already overwhelming amounts of excess inventory; (ii) in Kishore's eyes, it provided an excuse for Tristar to not record on the Financial Statements the additional inventory and corresponding liabilities (i.e., expenses owed) to the suppliers; and (iii) it made the detection of the fraud that much harder for Spectrum because the products were being held offshore. Placing the shipments on hold caused those liabilities to simply disappear from Tristar's and the Company's

Financial Statements—an accounting tactic that neither complies with GAAP nor reflects the reality that the Company would eventually have to receive and pay for those shipments.

120. Kishore was at the helm of this ploy. On October 26, 2021, he emailed Tristar's sales teams and inventory planners, advising that he was "concerned about the sell through and the inventory, as we are at a very high level and we have a lot of goods still scheduled to ship from [Tristar's suppliers in] China." He asked the group to cancel purchase orders with the suppliers or place them on hold, which would facilitate his goal of selling the Company. Kishore himself thus recognized plummeting demand for Tristar's products, the excess inventory problem, and that even Tristar's extraordinary sales tactics would not cure these woes completely.

121. Tristar's employees followed Kishore's instructions. As a result, the suppliers did not ship roughly $5.3 million worth of products. This on-hold inventory consisted of excess inventory that Tristar was struggling to move out of its warehouses and that retail customers could not sell. In fact, Tristar had at least 10 months' worth of inventory on hand for over 95% of the products placed on hold, not to mention the substantial excess inventory at the retailers.

122. Shortly after the Closing, however, Spectrum discovered all the purchase orders that had been placed on hold, just like Spectrum discovered all Tristar's undisclosed VFF Dilution and Non-VFF Dilution with the retail customers. And like them, the suppliers turned to Spectrum and demanded the Company honor Tristar's obligations by taking delivery of and paying for the products. Moreover, Spectrum faced the threat of additional fees and punitive charges because the suppliers were made to hold and store that inventory for an extensive period of time.

123. Ultimately, the Company was forced to accept the inventory manufactured by the suppliers, most of which was worth mere pennies on the dollar, at best, because it was excess and/or obsolete and because Tristar had already saturated the retail channels.

124. As such, accepting this inventory resulted in a loss, and the Company also incurred additional costs related to the storage and disposal of this inventory.

125. By placing this vast volume of excess and/or obsolete inventory on hold, Tristar and Kishore intended to—and did—deliberately misrepresent the Company's liabilities and misled Spectrum with respect to the extent of Tristar's excess inventory problem.

126. The sum total of all this undisclosed misconduct was that Tristar and Kishore knew that their representations, warranties, and covenants in at least Sections 3.8(a), 3.8(b), and 3.8(c) of the MIPA were false. Contrary to their False RW&C, Tristar and Kishore knew the Financial Statements provided to Spectrum were not true, correct, and complete, did not fairly present in all material respects the financial position and results of operations of the business, and did not conform with GAAP. Further, Tristar and Kishore also knowingly misrepresented the Company's liabilities—despite their representation and warranty that the Company did not have and at the Closing would not have any liabilities of any kind or type other than those disclosed, whether absolute, accrued, unasserted, known, unknown, contingent, or otherwise—by knowingly failing to account for the liabilities in connection with Dilution, and cancelling or placing on hold purchase orders for more inventory with Tristar's suppliers and knowingly not recording that liability. Finally, Tristar and Kishore knew that their False RW&Cs regarding the Company's accounting controls were false, as evidenced by Tristar and Kishore ignoring written concerns raised internally at Tristar regarding its controls for recording Dilution. These lies were intended to, and did, misrepresent the Company's financial condition and induce Spectrum to buy the Company.

**C. The Products Misrepresentations: Hold the Line with Unsalable Goods.**

127. Tristar and Kishore also misrepresented and concealed from Spectrum that the products Tristar was selling to Spectrum under the Acquisition did not conform to applicable

Product Warranties and Contractual Commitments, had defects, constituted Events of Default, and were not of a quality and quantity to be used and sold in the ordinary course.

128. Had Tristar and Kishore not done so, Spectrum would have learned that the Company's core products—such as juicers, wafflizers, and certain air fryers—had to be recalled and for that and many other reasons could not be sold. At a minimum, disclosing these issues to Spectrum would have increased dramatically the Company's liabilities, contingent or otherwise, thus deteriorating the Company's financial performance. And eliminating the Company's sales of these products altogether would have upset a fundamental component of the Acquisition and made it impossible for the Company to achieve the represented financial performance. Thus, Tristar and Kishore were motivated to claim there were no issues with the Company's products.

129. At least Kishore, Fisher, Hendrick, Myers, and Myers's direct report (Tristar's then-Associate General Counsel) had Knowledge about these poor-quality and unsafe products. Under the MIPA, Tristar thus is deemed to have had Knowledge of these issues as well.

130. A particularly problematic product was the PowerXL Model SHL96 and Model SHL90-SC Self-Cleaning Juicers (the "Juicers"). Before the Closing, Tristar received complaints from consumers reporting defects in and quality problems with the Juicers and related injuries.

131. For instance, in summer 2021, the CPSC contacted Tristar reporting a claim from an end-line consumer that the Juicer had "exploded," causing the metal piece to "br[eak] off and hit her in the stomach, making a one-inch laceration."

132. This was not an isolated incident. End-line consumers submitted serious complaints to Tristar about defects, serious injuries, and quality issues concerning the Juicers, totaling at least 181 complaints before the Closing. For example, consumers reported that:

a. "[T]he juicer blade split in two, broke through the receptacle, and hit her in the chest."

b. "[T]he unit exploded and he was cut on his arm and belly."

c. "[T]he unit smelled, exploded, and cut their hand."

d. "[T]he unit shot pieces of plastic, which hit her shoulder, chest, and neck."

e. "[T]he unit hit and caused burns, scratches, and lesions to her breasts and stomach."

133. Tristar was well aware of these problems. In June 2021, Tristar's assistant project manager ("Assistant Project Manager") analyzed a batch of 168 Juicers that end-line consumers returned to Tristar and reported to Hendrick that 157 of the 168 were returned due to defects, 21% of which were major defects related to the Juicers' blades and grinding function.

134. Retail customers also expressed their concerns to Tristar about the Juicers. For instance, starting in January 2021, Tristar employees, including Myers's direct report, received several notices from a retail customer notifying Tristar of a "potential safety concern" regarding the Juicers. That retail customer also informed Tristar that it had reported the Juicer defects of which it was aware to the CPSC based on its own assessment of the hazard and urged Tristar to do the same, which would have triggered—and, indeed, ultimately did trigger—a recall and inability to sell the Juicers. Instead, Tristar failed to make such a report to the CPSC.

135. Tristar also was well aware before the Closing of defects, serious injuries, and quality issues concerning the PowerXL Model ESWM02 and Model ESWM03 Stuffed Wafflizer waffle makers (the "Wafflizers"). Tristar received numerous reports that these Wafflizers exploded during use, expelled heated batter, and caused burns to end-line consumers.

136. Tristar was aware of at least 15 serious end-line consumer complaints before the Closing reporting injuries from the Wafflizers, including, for example, the following:

a. "Consumer reported that when he touched the latch the hot batter exploded from the unit, burning his face and arms."

b. "Consumer reported that when he opened the latch pie filling exploded from the unit, burning his hands and legs."

c. "Consumer reported that after she turned the unit to check the waffle, the unit exploded and food went everywhere, burning her chin and arm."

137. Tristar even hired a chef to film a cooking segment at Tristar's studio using the Wafflizer in October 2021. While filming on Tristar's property, the Wafflizer exploded, causing the clasp of the device to hit the chef's son who was standing nearby in the studio.

138. Finally, Tristar also was aware of issues with the PowerXL Model DUAF-010 and Model DUAF-005 Vortex Dual Basket Air Fryers (the "Air Fryers"), which are egg-shaped air fryers with two cooking baskets connected by a plastic piece (the "U-Channel Connector").

139. In the "Pilot Run" report for the Air Fryers, Tristar was informed that the U-Channel Connector was defective, leading Tristar to change the design of the Air Fryer. Even though Tristar was required to change the design and did so, it continued to sell the old, defective design in addition to the new one. Spectrum was never told before the Closing that there had been a design change, much less that the product was defective or Tristar had received several reports of the U-Channel Connector arriving broken upon receipt, breaking when end-line consumers were attempting to install, remove, or clean the baskets, or otherwise being broken.

140. Despite Tristar's Knowledge of these defects, serious injuries, and quality issues concerning the Juicers, Wafflizers, and Air Fryers, Tristar never reported them to the CPSC—as required by applicable laws and regulations—and did not disclose any end-line consumer complaints or any potential defects to Spectrum before the Closing. Spectrum also did not obtain Knowledge about these defects through its extensive diligence or any other means. Nor could Spectrum have. Information about the defects, breaches of the Product Warranties and Contractual Commitments, and Events of Default under the Company's contracts was not available other than through Tristar, including publicly. In response to Spectrum's inquiries, Tristar concealed these

issues and affirmatively lied to Spectrum, stating that there were no concerns regarding the ability to meet all requirements and quality standards under the Company's current contracts with the retail customers for the foreseeable future and that it was unaware of any product defects.

141. After obtaining access to Tristar's records following the Closing, Spectrum became aware of the defects and quality issues—including as a result of a July 2022 report that an end-line consumer had been lacerated in the neck by the Juicer, requiring significant medical attention.

142. After learning following the Closing of these issues with the Juicers, Wafflizers, and Air Fryers, Spectrum diligently investigated and promptly reported them to the CPSC as required by applicable laws and regulations. Due to Tristar's and Kishore's False RW&C, as well as the disorganization of the relevant information Tristar provided to Spectrum as part of the Acquisition, this process was difficult, time-consuming, and expensive, causing delays.

143. In accordance with CPSC requirements and guidance, Spectrum implemented stop sales of the Juicers, Wafflizers, and Air Fryers, and those products were recalled.

144. Thus, contrary to Tristar's and Kishore's False RW&C, the Air Fryers, Juicers, and Wafflizers clearly were not of sufficient quality and quantity to be used and sold in the ordinary course of business and continue operating the business post-Closing in the same manner as before the Closing, salable in the ordinary course, or in compliance with Product Warranties or Contractual Commitments, and they amounted to Events of Default under the Company's contracts.

145. In fact, the opposite was true. These issues meant the Air Fryers, Juicers, and Wafflizers were not of sufficient quality and quantity to be used and sold in the ordinary course of business and amounted to material breaches or default of the Company's Product Warranties and Contractual Commitments and Events of Default, including but not limited to these provisions in the Company's agreements with key retail customers:

a. Largest Retail Customer Supplier Agreement, Section 13(f): "The Merchandise shall be delivered in good and undamaged condition and shall, when delivered, be merchantable and fit and safe for the purposes for which the same are intended to be used, including but not limited to consumer use."

b. Retailer Supplier Agreement, Section 13(f): "The Merchandise shall be delivered in good and undamaged condition and shall, when delivered, be merchantable and fit and safe for the purposes for which the same are intended to be used, including but not limited to consumer use."

c. Retailer Conditions of Contract, Section 5: "Breach. Any of the following is a breach of the Contract by Vendor . . . B. Goods are defective in whole or in part, are not of merchantable quality or are otherwise not fit for the intended purposes sold, as determined by [retailer] in its sole discretion; C. any breach of Vendor's representations, warranties or guarantees; . . . F. a claim is made (whether founded or unfounded) or Purchaser has reason to believe that (a) the Goods contain defects or hazards that would create a substantial risk of injury to any person or property . . . ."

d. Retailer Conditions of Contract, Section 10(d): "Merchantability, Fitness, Conformance, Non-Infringement. Vendor represents, warrants and guarantees that Goods (i) are merchantable, (ii) are of good quality and workmanship, (iii) are free from defects, latent or patent, in material, design and workmanship, (iv) are fit, sufficient and safe for their intended purpose and for the particular purpose for which purchased, if Vendor knows or reasonably should know of such purpose, (v) are in conformity in all respects with all specifications, performance standards, drawings, samples or descriptions, furnished, specified or adopted by Purchaser, (vi) pass all applicable tests pursuant to any legal, Purchaser or other protocol or standard, (vii) are free of any claim of any third party, . . . ."

e. Retailer Merchandise Purchase Order Terms & Conditions, page 5: "You [i.e., Tristar] certify, warrant, covenant, and represent that all Merchandise (including all of its related packaging, labeling, and printed and digital materials) delivered pursuant to our Purchase Order will: . . . (b) be free from any defects in design, construction, material, packaging, or workmanship . . . ; [and] (g) be fit and safe for sale and any use by us or our customers for which such items are originally intended and any particular intended use . . . ."

f. Retailer Basic Supplier Agreement, Section 12.1(c): "Supplier represents and warrants that: . . . (c) the Product is without defects and has adequate warnings and instructions."

g. Retailer Agreement, Appendix C, Section 2: "[I]n addition to all warranties implied by law, . . . the Merchandise . . . shall . . . be free from defects in design, workmanship or materials" and "possess all performance qualities and characteristics claimed in advertisements."

146. Further, these material breaches and/or defaults carried substantial consequences, including amounting to Events of Default, and risked significantly impairing the Company's relationship with these retailers, including by, among other things:

a. Canceling, at the retailer's "sole and absolute discretion, without [the Company's] authorization, at any time" any product(s) "which [are] defective in material, design, and/or workmanship or which differs in any way from the terms, specifications, and warranties therein."

b. Requiring the Company to "offset the expenses that may arise" when "all or a significant portion of a product line(s) is defective, substandard, [or] unsafe" such that they must be recalled from stores; and/or

c. Terminating the entire relationship between the retailer and the Company.

147. Additionally, by failing to report these defects to the CPSC, Tristar was not in compliance with all applicable laws and regulations as Tristar and Kishore knowingly misrepresented, including the Consumer Product Safety Act ("CPSA"), § 15 U.S.C. 2064(b), which required Tristar to report safety hazards to the CPSC. Indeed, after the Juicer and Wafflizer defects were finally properly reported to the CPSC after the Closing, the CPSC's Division of Enforcement and Litigation launched an investigation into Tristar's failure to comply with the CPSC's reporting requirements before the Closing, which investigation is still ongoing.

148. Spectrum never would have purchased these products (or the Company) from Tristar if it had known that they were defective, suffered from quality issues, reportedly posed any danger to end-line consumers, or the Company was not in compliance with all applicable laws, Product Warranties, and Contractual Commitments. Spectrum places the utmost importance on the safety of its end-line consumers and their ability to use Spectrum products as intended and in accordance with all Product Warranties and Contractual Commitments, including those indicated above and the implied warranties of fitness and merchantability under applicable law.

149. As a result of these issues, the Company was unable to sell these products, wrote-off all the unsalable inventory that Tristar had falsely represented as assets, and incurred millions of dollars in expenses in carrying out the recalls. As well, the quality issues with and defects in the Air Fryers, Juicers, and Wafflizers, including the required product recalls, significantly tarnished the Company's business reputation and the Brands with the public, retail customers, and end-line customers. This harm was particularly egregious given that the Company and the Brands had just been acquired by Spectrum. These factors contributed to the significant harm caused by Tristar and Kishore to the Company's and Spectrum's customer relationships, which they misrepresented and concealed under the False RW&C. All this had a substantial negative impact on the Company's revenue and profits, in addition to the other damages discussed below.

150. In light of these issues, Tristar and Kishore knew that their representations, warranties, and covenants in at least Sections 3.10, 3.18, 3.22, 3.25, and 3.28 were false as of the Closing. Contrary to their False RW&C, Tristar and Kishore knew demand for Tristar's products was plummeting and that the products exhibited defects, failed to conform with Product Warranties and Contractual Commitments, constituted numerous Events of Default, and were not of a quality and quantity to be used and sold in the ordinary course. Finally, Tristar and Kishore knew Tristar was not in compliance with all applicable laws, including but not limited to the fact that they knew Tristar was required, but failed, to report the relevant incidents and defects to the CPSC.

## V. Tristar's and Kishore's Covenants and Closing Conditions Also Were Fraudulent.

151. The False RW&C also amount to fraudulent covenants and Closing conditions.

152. In addition to Tristar's and Kishore's representations and warranties, the MIPA also provides for further obligations owed by Tristar and Kishore with respect to the Closing. For example, under Section 6.2, Tristar and Kishore covenanted that through the Closing, they would

"maintain and preserve" the Company's customers (as well as its suppliers and employees), not cause a Material Adverse Effect to the Company, and not sell inventory other than in the ordinary course of business. Similarly, Spectrum's obligation to close the Acquisition was conditioned on the truth of Tristar's and Kishore's representations, warranties, and covenants in the MIPA and no Material Adverse Effect to the Company having occurred before the Closing.

153. The False RW&C reflect that the conditions for Closing were not met and Spectrum had no obligation to close the Acquisition as of the Closing. As well, far from "maintain[ing] and preserv[ing]" Tristar's customer relationships, including with the retailers and end-line consumers, Tristar's extraordinary pre-Closing sales tactics (including selling products outside the ordinary course) and the defects and safety and quality issues with the Air Fryers, Juicers, and Wafflizers, among other things, substantially impaired those relationships, tarnished the Company's and the Brands' business reputation, and caused the Company massive harm. All this reflects actions causing Material Adverse Effects to the Company, including the losses alleged herein, providing yet another reason the conditions for Spectrum to close the Acquisition were not met.

154. For these reasons, Sections 6.2 and 7.2 were false as of the Closing. Tristar and Kishore knew as much and, thus, that the conditions for Closing had not been satisfied, yet they intentionally misled Spectrum into Closing the Acquisition. Had Spectrum known the truth, it would not have proceeded to purchase the Company. Having been fraudulently induced to do so, however, Spectrum suffered substantial losses, including the damages alleged herein.

**VI. Defendants' Frauds Also Caused Spectrum Harm Under Ancillary Agreements.**

155. In addition to executing the MIPA, Spectrum also was fraudulently induced to enter into and/or assume liabilities under the Ancillary Agreements, as required by or in connection with

the MIPA's terms. Had Spectrum known that the False RW&C were not true, Spectrum would not have caused the Ancillary Agreements to be entered into, as described below.

156. Reno, Wyomissing, and Fairfield Leases. Under Section 7.3(b)(viii) of the MIPA, Spectrum was required to execute on behalf of the Company lease agreements for warehouse and office space in Reno, Nevada, Wyomissing, Pennsylvania, and Fairfield, New Jersey (collectively, the "Leases") with the Real-Estate Companies, which are owned and/or controlled by Kishore, Anjali, and Sowers. Spectrum agreed to the Leases based on Tristar's and Kishore's false portrayal of the Company in the False RW&C. In truth, however, nearly all this warehouse space and a substantial portion of the office space were unusable due to true condition of the Company, including its plummeting demand and lack of sales, all of which was hidden from Spectrum. For example, the Company at most used barely half the warehouse in Reno and later had to vacate those premises due to non-use. The Company also ceased using the office space in Wyomissing, and it only uses a portion of the space in Fairfield. Had Spectrum known the truth, it would not have agreed to the Leases or the millions of additional dollars in rent due under them, which diminished the value of the Company and the profits Spectrum could realize from the Acquisition.

157. Fosdick Leases. Similarly, pursuant to the MIPA, Tristar and Kishore also induced Spectrum to cause the Company to assume Tristar's obligations under agreements with Fosdick Fulfillment, including lease agreements for warehouses in Sparks, Nevada, Meriden, Connecticut, New Britain, Connecticut, and Berlin, Connecticut (collectively, the "Fosdick Leases"). As with the other leases discussed above, these leases also confirmed Tristar's and Kishore's fraudulent intent because they, too, were almost wholly unnecessary to the continued business operations as they truly existed, as opposed to how Tristar and Kishore represented them. The Company has ceased using the premises in Sparks, Berlin, and Meriden, but it nevertheless is still being forced

to pay under the corresponding leases for unusable real estate. As with the Leases, the payments made under the Fosdick Leases diminished the profit Spectrum could realize from the Acquisition.

158. Consulting Agreements. Additionally, Spectrum never would have executed an Independent Contractor Agreement effective as of February 21, 2022, and an Independent Contractor Agreement dated August 1, 2022 (the "Consulting Agreement"), under which it was improperly induced to make hundreds of thousands of dollars in payments for worthless consulting services to, ultimately, Anjali (through Business Builders, Inc.) and to Kishore (through Tristar), respectively. To the point, under the pretense of acting as a consultant to Spectrum, Kishore repeatedly criticized Spectrum and its employees to Spectrum's management, in a baseless effort to distract from his and Tristar's frauds and the Company's poor performance after the Closing.

159. Other Ancillary Arrangements. Finally, Spectrum was falsely led to believe that Tristar's sales team and other key employees played a crucial role in Tristar's success, and accordingly, and as agreed to by Spectrum and the retail customers, the key Tristar employees moved over with the Company and became employed by Spectrum, including Fisher (who became the general manager for the Company's operations in North America), Hendrick, their direct reports, and the sales representatives in charge of the two largest customer accounts. Spectrum even entered into retention agreements with around 50 former Tristar employees to secure their continued employment at Spectrum for at least one year after Closing. Thus, the same individuals who had managed sales, inventory, and retail customer relationships before the Closing continued to do so after the Closing. Moreover, Kishore and Anjali were given consulting agreements which allowed them broad discretion post-Closing. It also gave Kishore the opportunity to repeatedly criticize the Company and its employees to Spectrum's management—claiming they did not "think big enough" and there was not enough funding for marketing—in a baseless effort to distract from his

and Tristar's frauds and the Company's resulting poor performance after the Closing. In other words, Kishore, Anjali, and key Tristar executives and employees maintained significant control over the Company after the Closing, which allowed them to conceal Kishore's and Tristar's fraud.

160. But for the False RW&C, Spectrum never would have agreed to enter into and/or assume liabilities under the Ancillary Agreements and only did so as a result of Tristar's and Kishore's fraud. These circumstances also caused substantial monetary losses to Spectrum.

**VII. Spectrum Has Sustained Hundreds of Millions of Dollars in Losses.**

161. The impact of Defendants' fraud scheme on Spectrum was devastating. At Closing, the Company's true value based on the actual financial and operational condition of the Company, had Spectrum been told the truth concerning the False RW&C, was a small fraction of the value Spectrum calculated for the Company and far less than half of the Purchase Price. All told, Spectrum has lost, at a minimum, (i) hundreds of millions of dollars, including at least $250 million in damages from the Acquisition as of the Closing, and (ii) millions more dollars, including out-of-pocket expenses such as to investigate Defendants' misconduct and bring this lawsuit.

162. Spectrum's damages as of the Closing which flow from the False RW&C include, among other things, (i) causing Spectrum to overpay the Purchase Price; (ii) the Company's diminished capacity to generate revenue and profits going forward; and (iii) causing the Company to incur millions of dollars in other needless liabilities such as the Ancillary Agreements.

163. *As to Spectrum's overpayment of the Purchase Price*: The Purchase Price was based, among other things, on a multiple of Tristar's final calculated EBITDA of $63 million, as is reasonable and customary in transactions such as the Acquisition. A recalculated price, based on accurate representations, warranties, and covenants by Tristar and Kishore, would require a nine-figure dollar reduction in the Purchase Price as of the Closing. Similarly, were Spectrum to

revalue its investment via the Acquisition after the Closing under a rescissory-damages approach, including damages since the Closing such as lost profits and out-of-pocket costs, the revaluation would be a small fraction of the expected return on Spectrum's committed investment. The nature and extent of all these damages were reasonably foreseeable to Tristar and Kishore as of the Closing, including to the extent viewed as consequential or indirect damages and/or based on a multiple of EBITDA or any other financial metric (whether trailing, forward, or otherwise).

164. *As to the Company's diminished capacity to generate revenue and profit*: As of the Closing, the Company was incapable of generating the economic benefits and value Spectrum reasonably expected from the Acquisition based on its reliance on the False RW&C and, in turn, its perception of the financial and operational condition of the Company. The true financial and operational condition at Closing of the Company resulted in a crushing loss of expected value compared to the represented value and resulting Purchase Price, which loss flowed from Tristar's and Kishore's intentionally False RW&C. The harm suffered by Spectrum as a result of being induced to purchase the Company in reliance on the intentionally False RW&C included, among other things, that (i) the channels were saturated with the Company's products; (ii) demand for the Product Lines had plummeted; (iii) there was substantial harm to the business reputation and value of the Company (including to the Brands and other products), and the Company's relationships with the retailers were significantly impaired because of, among other things, Tristar's extraordinary sales practices, known defects in the Air Fryers, Juicers, and Wafflizers, their failure to conform with the applicable Product Warranties and Contractual Commitments, and Tristar's and Kishore's decision to cut advertising, marketing, and new-product expense before the Closing for purposes of improving the Company's apparent financial condition so Spectrum would buy it; and

(iv) the Company's sales would decrease substantially after the Closing. These misrepresented and concealed harms manifested in many ways soon after the Closing, such as:

a. One retailer delisted and no longer sold nearly all the Company's products. Other retailers ceased selling a number of those products as well.

b. The Company was told plummeting demand and reduced sales were specific to the Company's products, i.e., the products were "losing market share with [Largest Retail Customer]." The Company also learned it had "a major Net Maintain margin issue. The Markdowns [were] really eating [Largest Retail Customer's] margin dollars," and Largest Retail Customer demanded more than $4 million from Spectrum given major challenges it had selling excess inventory of the Company's products. Finally, Largest Retail Customer stopped and then ultimately delisted certain of the Company's products.

c. The Company lost important holiday placements of its products, including Air Fryers, in 2022 and 2023, including at Largest Retail Customer.

d. The Company was not able to sell the Air Fryers, Juicers, and Wafflizers due to the defects in those products, their failure to conform with the applicable Product Warranties and Contractual Commitments, and required recalls.

165. *As to the Company's other needless liabilities as of the Closing*: Tristar's and Kishore's False RW&C also fraudulently induced Spectrum to agree to and/or caused the Company to needlessly incur millions of dollars in other liabilities as of the Closing. These liabilities included, but were not limited to, expenses to destroy products which were defective, obsolete, and poor quality and/or which did not comply with Product Warranties and Contractual Commitments; to pay Kishore, Anjali, and the Real-Estate Companies under the Ancillary Agreements; and to needlessly hire, terminate, and separate (including by way of severance payments) dozens of employees who had run, or were otherwise employed by, the Company before the Closing and were described by Tristar and Kishore to be essential to its success.

166. Spectrum prepared a Closing valuation model, which was intended to be a conservative calculation of the value and future economic benefits Spectrum expected to enjoy based on the representations, warranties, and covenants in the MIPA. That value included:

| | 2022 | 2023 | 2024 |
|---|---|---|---|
| **Net Sales** | $526 million | $561 million | $588 million |
| **EBITDA** | $55 million | $62 million | $68 million |

167. However, below are the final financial results for year-end 2022, 2023, and 2024, which is in addition to losses Spectrum will continue to incur in 2025. These figures show, among other things, the destruction of the Company's profit-generating capacity as of the Closing:

| | 2022 | 2023 | 2024 |
|---|---|---|---|
| **Net Sales** | $327 million | $151 million | $115 million |
| **EBITDA** | $13 million | ***negative*** $127,000 | ***negative*** $4 million |

168. These decreased net sales and EBITDA figures—a vast drop from Spectrum's conservative Closing valuation model—are the direct result of Tristar's and Kishore's False RW&C. To the point, Spectrum reasonably expected that future sales of the products it purchased from Tristar would have generated about $175 million more in profits for 2022 through 2024, and substantial profits in 2025 and beyond, which profits would flow inexorably to Spectrum. Those figures were consistent with the $125 million agreed-upon earnout payable to Kishore that would have triggered had the Company met gross profit targets of at least $209.1 million for each of 2022 and 2023. In reality, the Company came nowhere close to that due to the False RW&C.

169. Finally, Spectrum also has sustained a separate quantum totaling millions of dollars in losses, including out-of-pocket expenses, as a result of Tristar's and Kishore's False RW&C, including to investigate the misconduct at issue, recover losses, and bring this lawsuit.

170. In sum, Spectrum has incurred hundreds of millions of dollars in losses, including at least $250 million in damages from the Acquisition as of the Closing, caused by Tristar's and Kishore's False RW&C—for which all Defendants are liable under their fraud scheme.

## VIII. Spectrum Has Satisfied Any Applicable Conditions Precedent.

171. Under the MIPA, at Spectrum's option, Kishore must indemnity Spectrum for Tristar's Fraud even absent any Fraud of his own.

172. Section 9.4(g) provides certain indemnification sequencing provisions, including with reference to a certain representations and warranties insurance policy (the "Policy"). These provisions are not applicable for Spectrum to recover for Fraud, however, as the exclusive remedy provision in Section 9.5 expressly carves out Fraud. Nevertheless, Spectrum has complied with Section 9.4(g) in full.

173. As to the Policy, under Section 9.4(a), Spectrum's obligation to "use commercially reasonable efforts to recover" under the Policy is "considered satisfied if [Spectrum] makes a claim against the applicable insurer to recover such Losses and such insurer fails to pay such Losses or admit coverage without reservation of rights with respect to such Losses within 180 days of such claim being made." Here, Spectrum submitted claims under the Policy to recover the losses it seeks against Defendants here, and 180 days later, no insurer paid "such Losses or admit[ted] coverage without reservation of rights with respect to such Losses." Thus, Spectrum's obligations with respect to claiming under the Policy have been satisfied.

174. In addition, Spectrum repeatedly demanded that Tristar authorize the release of funds from the Indemnity Escrow Amount to satisfy, in part, the losses which Spectrum seeks by way of this lawsuit, but Tristar and Kishore rejected those demands.

175. To be clear, Spectrum did not—and could not—uncover the truth about Defendants' fraudulent conduct described herein until after the execution of the MIPA and a subsequent investigation. This is true both because such information was in the exclusive possession of Tristar, Kishore, and Tristar's executive team and their agents, and thus inherently unknowable to

Spectrum, and because Kishore, Tristar, and others took pains to falsify documents, lie in response to direct questioning, and otherwise fraudulently conceal their conduct.

176. Thus, Spectrum has no choice but to initiate this lawsuit to (i) recover for the Fraud and related misconduct alleged herein and (ii) otherwise enforce its indemnity rights.

**COUNT I: FRAUD**
**(Against Tristar and Kishore)**

177. Spectrum incorporates Paragraphs 1 through 176 as though fully set forth herein.

178. "Fraud" is expressly actionable under the MIPA and is defined as fraud "(i) in the making of any representation, warranty, covenant, or agreement" in the MIPA, or "(ii) otherwise in connection with the transactions contemplated" in the MIPA. Fraud is excluded from the indemnity exclusive remedy provisions in the MIPA.

179. Under Delaware law, Fraud exists when (1) Defendants made a false representation or warranty of fact, or a fraudulent covenant; (2) with the knowledge or belief that the representation, warranty, or covenant is false or fraudulent; (3) intending to induce Spectrum's reliance on the false statements or fraudulent covenants; (4) on which Spectrum actually and justifiably relied; and (5) caused Spectrum to suffer harm. That is exactly what occurred here.

180. As alleged herein, Tristar and Kishore knowingly and intentionally misrepresented the False RW&C, i.e., their representations, warranties, and covenants at Sections 3.8(a), 3.8(b), 3.8(c), 3.9(a), 3.9(b), 3.10, 3.18, 3.22, 3.24, 3.25, 3.28, 6.2, 7.2(a), and 7.2(c) of the MIPA.

181. Tristar knew that the False RW&C were not true.

182. Kishore was knowingly complicit in the False RW&C made by Tristar and knew that the False RW&C were false at the time that the MIPA was signed. Under Delaware law, Kishore is, therefore, liable for Tristar's misrepresentations in the MIPA.

183. The False RW&C were intended to, and did, induce Spectrum to execute the MIPA, pay the Purchase Price, and agree to the Ancillary Agreements, among other things.

184. At all relevant times, as discussed above, Spectrum was unaware of the falsity of the False RW&C. Spectrum justifiably relied on the False RW&C to its detriment, including without limitation, by executing the MIPA, paying the Purchase Price, and agreeing to the Ancillary Agreements, among other things.

185. Tristar's and Kishore's conduct alleged herein constitutes fraud in the inducement as well as fraud or intentional misrepresentation of the False RW&C.

186. As a direct and proximate result of Tristar's and Kishore's knowing and deliberate False RW&C, Spectrum has suffered substantial damages in an amount to be proven at trial. Had Spectrum known the False RW&C were false, it would not have executed the MIPA, paid the Purchase Price, or agreed to the Ancillary Agreements, among other things.

WHEREFORE, Spectrum requests that the Court: (1) enter judgment in favor of Spectrum and against Tristar and Kishore; (2) award its monetary damages in an amount to be established at trial; (3) award its attorneys' fees, costs, and expenses under Article IX of the MIPA; and (4) grant any other just and proper relief.

## COUNT II: CONTRACTUAL INDEMNIFICATION
**(Against Tristar and Kishore)**

187. Spectrum incorporates Paragraphs 1 through 176 as though fully set forth herein.

188. Spectrum brings this contractual claim for indemnification against Tristar and Kishore under Article IX of the MIPA.

189. Under Section 9.2, Tristar and, at Spectrum's option, Kishore "shall indemnify, defend, and hold [Spectrum] harmless from any damages, losses, liabilities, obligations . . . interest or expenses (including reasonable out-of-pocket attorneys' fees and expenses) ('Loss') as a result

of, in connection with, or arising out of," among other things, any Fraud by Tristar, the Company, or Kishore before the Closing. "Fraud" is expressly actionable under the MIPA and is defined as fraud "(i) in the making of any representation, warranty, covenant, or agreement" in the MIPA, or "(ii) otherwise in connection with the transactions contemplated" in the MIPA.

190. As alleged herein, Tristar and Kishore knowingly and intentionally misrepresented the False RW&C; Tristar and Kishore knew the False RW&C were false and intended to induce Spectrum to execute the MIPA, pay the Purchase Price, and agree to the Ancillary Agreements, among other things; and Spectrum actually and justifiably relied on the False RW&C to its detriment, including without limitation by executing the MIPA, paying the Purchase Price, and agreeing to the Ancillary Agreements, among other things. Tristar's and Kishore's conduct constitutes fraud in the inducement as well as fraud or intentional misrepresentation of the False RW&C.

191. As a direct and proximate result of Tristar's and Kishore's knowing and deliberate False RW&C, Spectrum has suffered substantial damages in an amount to be proven at trial. Had Spectrum known that the False RW&C were false, it would not have executed the MIPA, paid the Purchase Price, or agreed to the Ancillary Agreements, among other things.

192. Spectrum thus is entitled to be indemnified for such Losses by Tristar and Kishore.

WHEREFORE, Spectrum requests that the Court: (1) enter judgment in favor of Spectrum and against Tristar and Kishore; (2) award its monetary damages as losses to be indemnified in an amount to be determined at trial; (3) award its attorneys' fees, costs, and expenses as additional such loss under Article IX of the MIPA; and (4) grant any other just and proper relief.

**COUNT III – CONSPIRACY TO COMMIT FRAUD**
**(Against All Defendants)**

193. Spectrum incorporates Paragraphs 1 through 176 as though fully set forth herein.

194. Tristar and the Real-Estate Companies knowingly entered into a confederation or combination under which Tristar committed fraud against Spectrum to induce it to enter into the MIPA, pay the Purchase Price, and agree to the Ancillary Agreements, among other things. KM Trust, AM Trust, Kishore, Anjali, and Sowers knowingly entered into a confederation or combination under which Kishore committed fraud against Spectrum to induce it to enter into the MIPA, pay the Purchase price, and enter into the Ancillary Agreements, among other things.

195. In furtherance of the conspiracy for Tristar to defraud Spectrum, the Real-Estate Companies were aware of Tristar's False RW&C to Spectrum and that their warehouse and office space were not needed, in whole or part, by the Company after the Closing because, among other things, sales of the Product Lines had plummeted, consumer demand was low and declining, and the Juicers, Wafflizers, and Air Fryers were defective. Still, the Real-Estate Companies—each in its individual capacity and for its own benefit—furthered their conspiracy with Tristar by negotiating the Leases with Spectrum, agreeing to accept the Leases, executing the Leases, and accepting millions of dollars in payments under the Leases, despite knowing the Leases were procured through Tristar's fraud against Spectrum and the Leases were not needed, in whole or part, as part of the Company's continued operations after the Closing. Tristar likewise furthered the conspiracy by committing the fraud alleged herein. Tristar and the Real-Estate Companies knew they were acting to perpetrate, or to further the commission of, a fraud by Tristar against Spectrum, and deliberately participated in and implemented said fraud against Spectrum.

196. In furtherance of the conspiracy for Kishore to defraud Spectrum, Anjali, the Trusts, Kishore, and Sowers took numerous overt acts while aware of Kishore's False RW&C to Spectrum. Anjali and Kishore formed the Trusts as of December 31, 2021, for the purpose of receiving tens of millions of dollars in fraud proceeds from the Acquisition and to avoid having to pay taxes

on such gains. As well, Anjali, Kishore, and Sowers variously as trustees of the Trusts, caused the respective Trusts of which they are trustees to provide, and the Trusts did provide, their written consent to the Acquisition despite knowing it was procured through fraud against Spectrum, without which Kishore's fraud could not have occurred. Anjali, Kishore, and Sowers also caused the Trusts to receive, and the Trusts did knowingly accept and receive, tens of millions of dollars in ill-gotten gains from Kishore's frauds in connection with the Acquisition, which were siphoned out of Tristar soon after the Closing, frustrating Spectrum's ability to secure meaningful indemnity and recover its losses from Tristar. Kishore likewise furthered the conspiracy by committing the fraud alleged herein and forming the Trusts. Kishore, Anjali, the Trusts, and Sowers knew they were acting to perpetrate, or to further the commission of, a fraud by Kishore against Spectrum, and deliberately participated in and implemented said fraud against Spectrum.

197. As a direct and proximate result of this misconduct, Spectrum was fraudulently induced into executing the MIPA, acquiring a company that was vastly different from the one it was told it was purchasing, paying the Purchase Price, and agreeing to the Ancillary Agreements, among other things. As a result, Spectrum has suffered substantial monetary damages.

WHEREFORE, Spectrum requests that the Court: (1) enter judgment in favor of Spectrum and against all Defendants; (2) award its monetary damages in an amount to be determined at trial; and (3) grant any other just and proper relief.

## COUNT IV – AIDING AND ABETTING FRAUD
**(Against Anjali, KM Trust, AM Trust, A&R, Centre Avenue, Mt. Anderson, and Sowers)**

198. Spectrum incorporates Paragraphs 1 through 176 as though fully set forth herein.

199. Tristar and Kishore committed fraud against Spectrum, and Anjali, the Trusts, the Real-Estate Companies, and Sowers actually knew about such frauds, including from Tristar and Kishore directly given the relationships among them, Tristar, and Kishore.

200. The Real-Estate Companies substantially assisted such frauds despite being aware of Tristar's and Kishore's False RW&C to Spectrum and that their warehouse and office space were not needed, in whole or part, by the Company after the Closing because, among other things, sales of the Product Lines had plummeted, consumer demand was low and declining, and the Juicers, Wafflizers, and Air Fryers were defective. Still, the Real-Estate Companies—each in its individual capacity and for its own benefit—negotiated the Leases with Spectrum, agreed to accept the Leases, executed the Leases, and accepted millions of dollars in payments under the Leases, despite knowing the Leases were procured through Tristar's and Kishore's fraud against Spectrum and the Leases were not needed, in whole or part, as part of the Company's continued operations after the Closing. But for the Real-Estate Companies' substantial assistance, the Acquisition would not have occurred and Spectrum would not have suffered the alleged losses.

201. Anjali, the Trusts, and Sowers also substantially assisted such frauds against Spectrum. Anjali caused the Trusts to be formed as of December 31, 2021, for the purpose of receiving tens of millions of dollars in fraud proceeds from the Acquisition and to avoid having to pay taxes on such gains. As well, Anjali and Sowers, variously as trustees of the Trusts, caused the respective Trusts of which they are trustees to provide, and the Trusts did provide, their written consent to the Acquisition despite knowing it was procured through fraud against Spectrum, without which Kishore's fraud could not have occurred. Anjali and Sowers also caused the Trusts to receive, and the Trusts did knowingly accept and receive, tens of millions of dollars in ill-gotten gains from Kishore's frauds in connection with the Acquisition, which were siphoned out of Tristar soon after the Closing, frustrating Spectrum's ability to secure meaningful indemnity and recover its losses from Tristar. But for Anjali's, the Trusts', and Sowers's substantial assistance, the Acquisition would not have occurred and Spectrum would not have suffered the alleged losses.

202. As a direct and proximate result of Anjali's, the Trusts', the Real-Estate Companies', and Sowers's substantial assistance of Tristar's and Kishore's frauds against Spectrum, Spectrum has suffered substantial monetary damages in an amount to be determined at trial.

WHEREFORE, Spectrum requests that the Court: (1) enter judgment in favor of Spectrum and against Anjali, the Trusts, the Real-Estate Companies, and Sowers; (2) award its monetary damages in an amount to be determined at trial; and (3) grant any other just and proper relief.

**COUNT V – UNJUST ENRICHMENT**
**(Against Anjali, KM Trust, AM Trust, A&R, Centre Avenue, and Mt. Anderson)**

203. Spectrum incorporates Paragraphs 1 through 176 as though fully set forth herein.

204. As to Anjali, Tristar transferred tens of millions of dollars in ill-gotten gains it received from Spectrum to Anjali. Spectrum was induced into executing the MIPA and paying Tristar (and thus Anjali) the Purchase Price based on Tristar's and Kishore's False RW&C. If Spectrum had known the truth, it never would have executed the MIPA and/or paid the Purchase Price. And so, given the fraud alleged herein and Anjali's knowing role in said fraud scheme, Anjali has been unjustly enriched by the monies she received, and it would be inequitable for Anjali to retain those monies. There is no justification for Anjali's retention of those monies, and such retention goes against fundamental principles of justice, equity, and good conscience.

205. As to the Trusts, Tristar transferred, directly or indirectly, tens of millions of dollars in ill-gotten gains it received to the Trusts. These Trusts were created at Anjali's and Kishore's direction for the purpose of receiving and sheltering these monies to avoid having to pay taxes on such gains. The Trusts also were obligated to approve the Acquisition, without which it never would have occurred. The Trusts gave their approval for the Acquisition even knowing of Tristar's and Kishore's fraud on Spectrum. As such, they have been unjustly enriched by the monies paid by Spectrum in reliance on Tristar's and Kishore's False RW&C, and it would be inequitable for

the Trusts to retain those monies. There is no justification for the Trust's retention of those monies, and such retention goes against fundamental principles of justice, equity, and good conscience.

206. As to the Real-Estate Companies, they have been unjustly enriched by retaining the full monthly rent payments under the Leases, which were procured through Tristar's and Kishore's fraud on Spectrum, of which the Real-Estate Companies were aware. The Real-Estate Companies also were aware that their warehouse and office space were not needed, in whole or part, by the Company after the Closing because, among other things, sales of the Product Lines had plummeted, consumer demand was low and declining, and the Air Fryers, Juicers, and Wafflizers were defective and of poor quality. Still, the Real-Estate Companies—each in its individual capacity and for its own benefit—negotiated the Leases with Spectrum, agreed to accept the Leases, executed the Leases, and accepted millions of dollars in payments under the Leases, despite knowing the Leases were procured through Tristar's and Kishore's fraud against Spectrum and the Leases were not needed, in whole or part, as part of the Company's continued operations after the Closing. Spectrum has been unjustly deprived of benefits by the payment of millions of dollars in rent to the Real-Estate Companies, which benefits Spectrum conveyed to them, whether indirectly or directly. The Real-Estate Companies have been unjustly enriched by the monies they received, and it would be inequitable for them to retain those monies. There is no justification for the Real-Estate Companies' retention of those monies, and such retention goes against fundamental principles of justice, equity, and good conscience.

WHEREFORE, Spectrum requests that the Court: (1) enter judgment in favor of Spectrum and against Anjali, the Trusts, and the Real-Estate Companies; (2) award its monetary damages in an amount to be determined at trial; and (3) grant any other just and proper relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Spectrum respectfully requests judgment in its favor and entry of an Order granting it the following:

I. An award of monetary damages (including, but not limited to, in the form of benefit of the bargain, rescissory, and/or lost profit damages, plus additional losses including, but not limited to, out-of-pocket expenses) which were caused by or otherwise resulted from Tristar's and/or Kishore's fraud and/or Defendants' other misconduct alleged herein;

II. An award of punitive damages;

III. An award of Spectrum's attorneys' fees, costs, and expenses;

IV. Pre-judgment and post-judgment interest; and

V. Such further relief to which Spectrum may be entitled and/or which the Court deems just and proper.

Dated: January 10, 2025

**GREENBERG TRAURIG, LLP**

<u>*/s/ Benjamin J. Schladweiler*</u>
Benjamin Schladweiler (#4601)
Schladweilerb@gtlaw.com
Renee Mosley Delcollo (#6442)
Renee.Delcollo@gtlaw.com
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801
Telephone: (302) 661-7000

*Attorneys for Plaintiff Spectrum Brands, Inc.*

*Of Counsel*:

Joseph J. Mamounas
Mamounasj@gtlaw.com
(*Pro hac vice forthcoming*)
Jessica Johnson Fishfeld
Jessica.Fishfeld@gtlaw.com
(*Pro hac vice forthcoming*)
Joshua M. Mandel
Mandelj@gtlaw.com
(*Pro hac vice forthcoming*)
Alexa Rosenson
Alexa.Rosenson@gtlaw.com
(*Pro hac vice forthcoming*)
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: 305-579-0500