## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SPECTRUM BRANDS INC.,<br><br>Plaintiff, Counterclaim-<br>Defendant<br><br>v.<br><br>TRISTAR PRODUCTS INC., KISHORE MIRCHANDANI, individually and as trustee of AM KARMA 2021 FAMILY TRUST, ANJALI MIRCHANDANI, individually and as trustee of KM KARMA 2021 FAMILY TRUST, STEVEN SOWERS, as trustee of AM KARMA 2021 FAMILY TRUST and KM KARMA 2021 FAMILY TRUST, AM KARMA 2021 FAMILY TRUST, KM KARMA 2021 FAMILY TRUST, A&R REALTY ENTERPRISES LC, CENTRE AVENUE LLC, and MT. ANDERSON LLC,<br><br>Defendants, Counterclaim-<br>Plaintiffs. | Civil Action No. 25-00046-RGA |

## MEMORANDUM ORDER

Before me is Plaintiff's Motion to Dismiss Counterclaim. (D.I. 67).[1] I have considered the parties' briefing. (D.I. 68, 77, 83). For the reasons set forth below, this motion is GRANTED.

Broadly, this case arises out of disagreements between the parties following the February 2022 sale of Defendant Mirchandani's membership interests in his former company, HPC Brands (now known as Empower), to Spectrum Brands. As a consequence of those disagreements, Empower filed a suit seeking relief based on contract theories. More than a year later, Spectrum filed this suit, which seeks relief based on both fraud and contract theories.

---

[1] All citations to docket items are to the docket in 25-00046-RGA.

1

Pursuant to Federal Rule of Civil Procedure 42(a), I consolidated the two cases "for the purposes of discovery including expert discovery." (D.I. 98).

Mirchandani and Tristar filed the same counterclaims in both cases. The counterclaims assert five counts: (Count 1) Breach of Contract (for breach of the "Independent Contractor Agreement" ("Consulting Agreement")) against Spectrum for failure to pay approximately $250,000 in consulting fees, (Count 2) Breach of Contract (for breach of the "Contribution and Assumption Agreement" ("Contribution Agreement")) against Spectrum and Empower for failure to turn over approximately two million dollars relating to amounts paid by third parties for certain "Excluded Products," (Count 3) Unjust Enrichment against Spectrum and Empower with respect to the unlawful retention of the two million, (Count 4) Breach of Contract (the "Membership Interest Purchase Agreement" ("MIPA")) against Empower for taking actions in bad faith with the primary purpose of avoiding or reducing various post-closing payments to Defendants, and (Count 5) Defendants seek a declaratory judgment against Spectrum and Empower releasing to them approximately $25 million in funds held in an escrow account (referred to as the Indemnity Escrow Amount or "IEA"). (D.I. 41 at ¶¶ 67-101).

Spectrum argues that any counterclaims against nonparty Empower should be dismissed because Empower is not a party to this action. (D.I. 68 at 4). Spectrum's assertion is correct. Empower is not a party to this action, 25-00046-RGA, but to a separate action, 23-01225-RGA.

When I consolidated the two actions for the purposes of discovery, I did so after briefing on the motion to dismiss had already been completed. The fact that I consolidated the two actions for such a limited purpose does not prevent me from dismissing the counterclaims filed against Empower in this action. In analyzing the predecessor statute to Rule 42(a) governing consolidation, the Supreme Court held, "We explained that the parties to one case did not

2

become parties to the other by virtue of consolidation." *Hall v. Hall*, 584 U.S. 59, 72 (2018).

"Rule 42(a) did not purport to alter the settled understanding of the consequences of

consolidation." *Id.* at 78.

Defendants note, "In any event, even if the Court dismisses the Counterclaims against

Empower in this case, those claims may still proceed against Empower in [23-01225-RGA] . . .,

while all counterclaims against Spectrum may proceed in this case." (D.I. 77 at 4). I agree; such

being the case, I dismiss all counterclaims without prejudice in this case against Empower. Thus,

since Spectrum was not named in Count 4 of the Counterclaims, I only need to consider

Defendants' arguments relating to the other four counterclaims.

Spectrum (hereinafter referred to as "Plaintiff") argues that Counts 1 to 3 are barred by

the MIPA's indemnification provisions. (D.I. 68 at 5-6). The relevant provisions read as follows:

> Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is eighteen (18) months from the Closing Date. . . . All covenants and agreements of the parties contained herein that by their nature are required to be performed after the Closing shall survive the Closing in accordance with their express terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the nonbreaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

(D.I. 68-1, § 9.1)

> Notwithstanding anything contained in this Agreement to the contrary, after the Closing, indemnification pursuant to the provisions of this ARTICLE IX shall be the sole and exclusive remedy for the parties hereto for any misrepresentation or breach of any warranty, covenant or other provision contained in this Agreement or in any certificate delivered pursuant hereto and for any claims with respect to the transactions contemplated by this Agreement, except for Fraud. Nothing in this ARTICLE IX shall affect any liability or obligation of any Person arising under or with respect to any other Document.

(*Id.* at § 9.5)

Plaintiff states that Counts 1 to 3 are covered by the MIPA, because they entail claims that Plaintiff "breached covenants or agreements contained in 'Documents,' which includes the MIPA, the Contribution Agreement, and 'each of the other agreements and certificates contemplated' thereby, including the Consulting Agreement." (D.I. 68 at 5-6). Plaintiff asserts

> Defendants do not allege a claim for indemnification in their Counterclaim. Nor can they, as the indemnification obligations expired on August 18, 2023. They also failed to provide written notice of any such claims for indemnification prior to that date, despite being aware of them. In fact, with respect to their claims arising under the Consulting Agreement and the Contribution Agreement, the only notice Defendants allege was in a letter dated September 12, 2023—a month after the expiration of any indemnification obligations.

(*Id.* at 6).

Stated another way, Plaintiff's argument is that Defendants lost the ability to pursue the counterclaims stated in Counts 1 to 3, because Defendants did nothing to raise them in the eighteen months following the execution of the MIPA.

Defendants respond by emphasizing that Section 9.1 of the MIPA states, "All covenants and agreements of the parties contained herein that by their nature are required to be performed after the Closing shall survive the Closing in accordance with their express terms." (D.I. 77 at 5, citing D.I. 68-1 at § 9.1). Defendants argue that Counts 1 to 3 thus are exempted from the eighteen-month survival period.

> Count I alleges that Spectrum breached the Consulting Agreement (effective as of August 1, 2022, more than five months after the Closing) by refusing to pay the consulting fees due for January, February, and March 2023. . . . Similarly, Counts II and III allege that Spectrum and/or Empower have improperly retained payments relating to Excluded Products—conduct which also necessarily occurred post-Closing.

(D.I. 77 at 5).

4

I do not think this is a good argument. The language cited by Defendants specifically notes that such covenants and agreements of the parties performed post-closing "shall survive the Closing in accordance with their express terms." (D.I. 68-1 at § 9.1). Yet Defendants cite no "express terms" in either the Consulting Agreement, the foundation for Count 1 (D.I. 41 at ¶ 68), or the Contribution Agreement, the foundation for Counts 2 and 3 (*Id.* at ¶ 75).[2] The citations they do have simply tie back to the bare allegations of their counterclaim. (*See* D.I. 77 at 5). Defendants' silence is noteworthy, because as to (dismissed) Count 4, one sentence later, Defendants specifically cite "Empower's obligations under [MIPA] Section 2.8(h)" to argue that Count 4 should be allowed to survive beyond the eighteen-month period. Defendants have demonstrated the ability to point out putative "express terms" that might warrant survival of post-closing covenants and agreements; their failure to do so with regard to Counts 1 to 3 thus leads me reasonably to believe that there are no such "express terms" in either the Consulting Agreement or the Contribution Agreement that would extend their survival periods beyond the eighteen months contemplated in the MIPA.

In the alternative, Defendants argue that they were not obligated to pursue remedies for Counts 1 to 3 "through the indemnification provisions in Article IX because they are based on 'Documents' rather than the MIPA itself." (D.I. 77 at 6). Defendants emphasize that Section 9.5 of the MIPA states, "Nothing in this <u>ARTICLE IX</u> shall affect any liability or obligations of any Person arising under or with respect to any other Document." (*Id.* citing 68-1 at § 9.5). The Consulting Agreement and Contribution Agreement are documents "other" than that of the

---

[2] Count 3 of Defendants' counterclaims does not cite the Contribution Agreement, as the counterclaim is for unjust enrichment. The factual predicates for Count 3 clearly mark it out as being based on the Contribution Agreement, however. (*Compare* D.I. 41 at ¶ 72 *with* D.I. 41 at ¶ 80).

MIPA, so, Defendants argue, "these claims are not subject to the MIPA's Exclusive Remedy provision, and Defendants were not required to pursue them through Article IX's indemnification process." (D.I. 77 at 7).

Plaintiff argues:

> Section 9.5 explicitly states that the indemnification provisions of Section 9 of the MIPA provide the "Exclusive *Remedy*" for the breach of any covenants contained in the MIPA and "for any claims with respect to the transactions contemplated therein." . . . The sentence on which Defendants rely says "[n]othing in this ARTICLE IX shall affect any *liability or obligation* of any Person or with respect to any other document," but says nothing about affecting the *remedy* provisions of Section 9. . . . In other words, Section 9.5 simply says that *liability* for the breach of the other Documents, such as the Consulting Agreement, is determined by that Document, but the "Exclusive *Remedy*" for a breach of the Document is found in Section 9 of the MIPA.

(D.I. 83 at 3-4).

Defendants argue, "If the MIPA intended to provide the sole and exclusive remedy for breaches of 'any other Document,' then necessarily by its terms it would be 'affect[ing] any liability or obligation . . . under or with respect to any other Document.'" (D.I. 77 at 8). The clause, read in such a way, would supposedly lead to an absurd result: "If read as [Plaintiff] propose[s], this provision would completely eliminate later-in-time performance obligations established by other Documents." (*Id.*).

I disagree with Defendants. First, I note that Section 9.5 of the MIPA states that indemnification pursuant to Article 9 "shall be the sole and exclusive remedy for the parties hereto . . . for any claims with respect to the transactions contemplated by this Agreement [i.e., the MIPA], except for fraud." (D.I. 68-1 at § 9.5). Section 6.3(g) of the MIPA states, "The Purchaser and the Founder shall negotiate in good faith regarding the terms of a consulting agreement between the Founder and the Company that would become effective at the Closing." (*Id.* at § 6.3(g)). The Contribution Agreement is referenced integrally multiple times throughout

6

the MIPA and listed as having been attached as Exhibit A to the MIPA. (*See id.* at Table of Contents; *see generally id.* at § 1.1). I think the Consulting Agreement and Contribution Agreement both constitute "transactions contemplated by" the MIPA.

Second, I cannot agree with Defendants' arguments against Plaintiff's reading of Section 9.5. Since I have found that Counts 1 to 3 are tied to "transactions contemplated by" the MIPA, it naturally follows that indemnification pursuant to Article IX of the MIPA would serve as the exclusive remedy for the parties as to these Counts. I accord no weight to Defendants' argument that reading the exclusive remedy provision in this way "would completely eliminate later-in-time performance obligations established by other Documents." (D.I. 77 at 8). This is because Section 9.1 of the MIPA states, "All covenants and agreements of the parties contained herein that by their nature are required to be performed after the Closing shall survive the Closing in accordance with their express terms." (D.I. 68-1 at § 9.1). If the Consulting Agreement or the Contribution Agreement (or "any other Document") had contained express terms permitting the survival of their claims following the 18-month survival period, then these express terms would have overridden the 18-month survival period. That Defendants failed to negotiate a more favorable deal for themselves in those other documents, however, does not now permit me to rewrite contractual language so as to grant Defendants more protection than that for which they had originally bargained.

Finally, Defendants argue that Plaintiff's "interpretations of Article IX . . . are not so unambiguously correct as to warrant dismissal of Defendants' Counterclaims at the Rule 12 stage." (D.I. 77 at 9). I disagree. The Consulting Agreement and Contribution Agreement are both unambiguously swept up into the exclusive remedy provision of Section 9.5 of the MIPA. Defendants have not pointed to anything in either the Consulting Agreement or Contribution

7

Agreement that would have excepted them from the ambit of Section 9.5. There thus exists no other reasonable interpretation of the contract language.

Defendants do not argue that they sought indemnification for Counts 1 to 3. Defendants' entire argument hinges upon the mistaken assumption that they were not required to do so. Therefore, I dismiss Counts 1 to 3.

Defendants' Count 5 concerns the status of $25 million currently held in an escrow account. (D.I. 41 at ¶ 95). Defendants seek a declaratory judgment that this money be released to them, "[o]nce [or if] the Court denies in whole or in part [Plaintiff's] claims." (*Id.* at 101).

Plaintiff represents, "[Defendants] do[] not allege any facts that suggest there is an actual disagreement or controversy between the parties with respect to how the [escrow account] is to be administered upon the conclusion . . . of the two lawsuits." (D.I. 68 at 16). "In other words, Count V seeks a declaration concerning the distribution of funds once liability is decided but fails to identify a dispute between the parties concerning that distribution upon the conclusion of the lawsuits." (D.I. 83 at 10).

Defendants attempt to create a controversy, stating, "If [Plaintiff] were not [currently] tying up the [escrow account] with baseless and/or unsupported claims, some or all of the funds in the [escrow account] would have already been released to [Defendants] under the terms of the MIPA and the Escrow Agreement. *See* Countercl at 32 ¶ 96[.]" (D.I. 77 at 18). Paragraph 96 of Defendants' counterclaims quote Section 2.3 of the MIPA: "[A]ny remaining balance of the [escrow account] . . . in excess of the amount of any outstanding escrow claims or disputes shall be released" 36 months after the closing date. (D.I. 41 at ¶ 96). But Defendants also plead that Plaintiff "claims that its indemnifiable Losses related to the fraud claims exceed the full [escrow account]" amount. (*Id.* at ¶ 97). Whether Plaintiff's claims are "baseless and/or unsupported" is

8

the subject of ongoing litigation that must be resolved in the first instance before a resolution of disbursal of the funds in the escrow account would be appropriate. So long as Plaintiff asserts a claim equal to or in excess of the total amount of funds in the escrow account, the plain language of the MIPA unambiguously requires that that amount not be paid out before resolution of the claim.

Plaintiff does not dispute that, should I rule against its claims, the money in the escrow account should be released to Defendants. (D.I. 83 at 10). A party "must establish a justiciable case or controversy with respect to each form of relief he or she seeks." *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 327 (3d Cir. 2014). Given the apparent lack of any such controversy from Defendants' pleaded facts, I dismiss Count 5 of the counterclaims.

All counterclaim counts are dismissed without prejudice.

Defendants request leave to amend (D.I. 77 at 19), but they have not proposed any particular amended complaint, and I therefore have no basis to grant that request. Should Defendants within fourteen days file a motion to amend their counterclaims, I will consider it then.

IT IS SO ORDERED.

Entered this 11th day of August, 2026

_____
United States District Judge

9